156 N.J. Super. 441 (1978)
383 A.2d 1220
JOSEPH A. LEMALDI, II, PLAINTIFF,
v.
DE TOMASO OF AMERICA, INC., LINCOLN-MERCURY DIVISION OF FORD MOTOR COMPANY, DE TOMASO AUTOMOBILE S.p.A. AND CLARIDGE LINCOLN-MERCURY, INC., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 30, 1978.
*444 Mr. Gary A. Werner for plaintiff.
Mr. Richard L. Plotkin and Mr. Daniel Ellis for defendants (Messrs. Pitney, Hardin & Kipp, attorneys).
LANDAU, J.S.C.
Following the jury verdict in this matter, defendants (hereinafter referred to as "Ford") moved in the alternative for judgment n.o.v., new trial or remittitur, limited to that part of the verdict which awards $8,000 to plaintiff for "mental anguish."
At the close of plaintiff's case I denied defendant's motion for dismissal of the claim. On the question of liability the jury had to determine whether such "mental anguish" was proximately caused and reasonably to be foreseen arising out of actions or failure to act of Ford regional personnel in dealing with plaintiff's complaint of continued uncorrected malfunctions of his defective Pantera sports car.
Ford's motions test whether, absent wanton or malicious conduct, an automobile manufacturer can be held liable for tortiously inflicting mental anguish through such action or inaction in any circumstance, and if so, whether the evidence in this case supports the jury finding, either as to causation or extent of damages.
Plaintiff initially sought recovery from Ford on counts of negligence, strict liability, breach of warranty and fraud under N.J.S.A. 56:8-19, and for punitive damages arising out of wanton and willful conduct. He dropped a request for rescission prior to trial, and his claim against the dealer was settled prior to selection of the jury. Following plaintiff's case certain motions for involuntary dismissal were granted, leaving in the case only the question of liability for repair and replacement costs, and the mental anguish issue. Ford does not here question the jury's award of $4,000 for repair and replacement costs.
*445 The respective standards governing motions for judgment, new trial and remittitur under R. 4:40-2(b) and R. 4:49 have been reviewed most recently in Baxter v. Fairmount Food Co., 74 N.J. 588 (1977), and earlier in Taweel v. Starn's Shoprite, 58 N.J. 227 (1971), and Dolson v. Anastasia, 55 N.J. 2 (1969). In the case of defendant's motion for judgment n.o.v. the motion must be denied if, accepting as true all of the evidence supporting plaintiff's position, and affording to plaintiff the benefit of all inferences which can reasonably and legitimately be made therefrom, reasonable minds could differ.
As to the new trial motion, a process of weighing is involved which requires a canvassing of the record, not only respecting the proofs, but with a view towards elements such as the demeanor of witnesses and "the feel of the case," sufficient to convince the court that there is a miscarriage of justice under the law.
With respect to the request for a remittitur, trial judges are cautioned not to interfere with the quantum of damages assessed by a jury unless it is so clearly disproportionate to the injury as to shock one's conscience and to convince the judge that to sustain the award would be manifestly unjust. Baxter v. Fairmount Foods, supra. There must be a pervading sense of wrongness, including factors such as manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, or a clearly unjust result.
Having in mind the foregoing standards, a brief review of the proofs is warranted.
Plaintiff was a personable young man, who convincingly recounted an unrebutted sequence of automotive horrors which commenced when he bought an expensive new sports car on the occasion of his birthday. The Pantera, imported from Italy, is a Ford product.
Lemaldi testified that on the very first day he drove the car, it pulled to the right. This condition persisted, defying *446 correction. He recounted a total breakdown and towing[1] only three weeks after he got the car. Three months after he bought the car it required a valve job and had transmission problems.
During the warranty period the air conditioner fell out in the street; bushings continually burned out; the windshield leaked, the windshield wiper malfunctioned. The car continually overheated, leading to severe mechanical failures; the seat tore repeatedly under normal usage; the transmission ground; the radiator leaked; there were clutch problems; and the pulling to the right was never corrected. These and other problems, plaintiff testified, kept his car in the shop for repairs an average of two times a month during the initial one-year warranty period.
Thereafter, the car continued to overheat, malfunction and breakdown, requiring constant towing, repair and parts replacement. Dozens of repair bills and the unrebutted testimony of several foreign car experts supported the jury finding that approximately $4,000 in post-warranty repair bills were attributable to defects in Pantera design and manufacture. Having been forced to rent cars on many occasions, Lemaldi ultimately had to purchase another car. The Pantera, beautiful but unusable, now rests in state in a carpeted garage which, plaintiff testified, looks "better than his room."
Although defendants argue that plaintiff's testimony respecting his contacts with Ford personnel were limited to one conversation in which a representative became hostile to Lemaldi, plaintiff in fact testified to a number of unsatisfactory contacts with various Ford personnel from the Teterboro office.
Even the testimony of Ford's sole witness supported plaintiff's case. Among the several defects found by Ford on a field visit were prematurely worn bearings, the prevention *447 of which was the subject of bulletins to Ford dealers. There was no evidence that Ford did anything to remedy the defects which it found, or that it advised plaintiff earlier of preventative or corrective measures.
There was unrebutted proof of two years in which plaintiff's $12,000 dream car became a nightmare of expense and breakdown. Against this background the jury reasonably could have determined that when Ford regional personnel, aware of plaintiff's problems with the Pantera's Ford-caused defects, failed to take or advise him of corrective action or to honor his claims, and responded to Lemaldi varyingly from open hostility to inattention; in the already exasperating circumstances such conduct would aggravate an ordinary man to the point of "mental anguish."
The defendant would have this court determine that Ford owed no duty to this plaintiff to avoid exposing him to unreasonable aggravation and mental distress, and that unless willful malicious conduct is shown, our law affords him no recompense for such injury. I do not agree. Duty is largely grounded in the natural responsibilities of social living and human relations, such as have the recognition of reasonable men; fulfillment is had by a correlative standard of conduct. Wytupeck v. Camden, 25 N.J. 450, 462 (1957). Insight into the state of mind in which an automobile manufacturer may expect to find the purchaser of a "lemon" was provided by the court in Zabriskie Chevrolet v. Smith, 99 N.J. Super. 441 (Law Div. 1968):
For a majority of people the purchase of a new car is a major investment, rationalized by the peace of mind that flows from its dependability and safety. Once their faith is shaken, the vehicle loses not only its real value in their eyes, but becomes an instrument whose integrity is fraught with apprehension. [at 458]
Recently, in Muniz v. United Hospitals, 153 N.J. Super. 79 (App. Div. 1977), reversing the trial court opinion reported at 146 N.J. Super. 512 (Law Div. 1976), the Appellate Division indicated a willingness to conceive of claims for *448 relief for emotional distress arising out of deviation from a standard of care reasonably to be expected in the circumstances, where there is reasonable foreseeability that such a deviation would induce disability in persons normally constituted. In Fiore v. Sears Roebuck, 144 N.J. Super. 74 (Law Div. 1976), the court "readily forsaw" circumstances where conduct of a defendant might be such as to justify award of damages for the way in which a claim was handled, pointing out that such claims, however, must involve tortious conduct, not breach of contract. As to breach of contract, the court in Fiore recognized the established prerequisite of reckless or wanton conduct to justify damages for mental suffering.
Ford argues that "the possibilities of liability are limitless if this court concludes that a plaintiff has shown a breach of a duty to avoid unreasonably aggravating conduct every time he testifies to an unpleasant conversation with an automobile manufacturer." Perhaps so, but as previously stated, these are not the Lemaldi facts. Defendants' various actions and failures to act were committed in the presence of an underlying history of a practically unusable car and gross expense and inconvenience, attributable to defendants' own manufacturing failures. While defendants' liability for those failures may be limited in many respects, subject to law[2], by its written warranty, subsequent acts of aggravation which inflict predictable and nonidiosyncratic distress upon a hapless purchaser should not be judicially encouraged by denying plaintiff this remedy.
With good reason, courts have been loath to recognize mental anguish claims. Subjective as they are, they offer a potential for abuse which dictates caution and the infrequency of circumstances deemed to justify judicial recognition of *449 such claims. In order for mental anguish to be recognized, there should be a reasonable guarantee against fraudulent or frivolous claims; the victim's response must not be idiosyncratic but reasonably to be anticipated in a normal person, and the claimed injury must be deemed sufficiently important to warrant elevation to a litigable right. The relationship of the parties must also be considered. Caputzal v. The Lindsay Co., 48 N.J. 69 (1966), Goldberg v. Housing Authority, 38 N.J. 578 (1962).
Unlike the facts in Caputzal, supra, the verdict here challenged by Ford was not based on strict liability for emotional consequences of defective manufacture. Neither was this the result of an isolated act of employee discourtesy arising in a routine commercial setting.
Caputzal does not, in my view, bar the imposition of a duty upon the initiator of a defective condition, to conduct properly its post-sale relationships with a consumer who has borne the brunt of that condition over a protracted period and spent nearly $12,000 for the product and $4,000 on repairs without securing product correction. The unique circumstances of this case afford sufficient guarantee that we are not dealing with a frivolous or fraudulent claim. It is difficult to imagine a healthy person in such circumstances who would not have suffered emotionally. At the very least, Ford had a duty to see to it that its representatives did not add to plaintiff's woe, and that active assistance was afforded to him.
The court has considered whether the injury to plaintiff may not be deemed serious enough to warrant remedy, Cf. Falzone v. Busch, 45 N.J. 559, 567 (1965). Were plaintiff to have suffered a total mental breakdown, however, this undoubtedly would have been deemed idiosyncratic, and consequently no basis for liability might be found. Cf. Caputzal, supra 48 N.J. at 77. On the other hand, if remedy is denied because the injury is deemed insufficiently grave, the manufacturer who sets in motion and then repeatedly compounds the problem would escape responsibility entirely. In *450 such circumstances, the policy scale should tip to the injured consumer.
Accepting as true all of the evidence supporting plaintiff's position and affording to him all inferences which can reasonably and legitimately be made therefrom, the jury reasonably could have found that Lemaldi suffered by reason of Ford's violation of duty to him and that Ford was liable to him for causing such mental anguish.
Accordingly the motion for judgment n.o.v. is denied.
Plaintiff's proofs of his "headaches", their origin, duration, extent, severity, disability, work loss, and related factors bearing on the question of damages, however, were practically nonexistent. Even considering defendants' questionable concession in brief and argument that plaintiff testified to experiencing headaches, there was insufficient evidence to support a jury award of $8,000 damages for mental anguish. Reasonably related and probable as some such injury may have seemed to the jury from the earlier described evidence, the only accurate way this Court can comment on the proofs to support the extent of mental anguish damages is to point up their absence. To sustain the jury verdict of $8,000 without evidence of the extent, duration, severity, relationship, and effect of plaintiff's symptoms would result in a miscarriage of justice. Defendant's motion for a new trial on the issue of damages for mental anguish is granted. R. 4:49-1(a). This disposes of the remittitur motion.
At the request of counsel, court action on the form of judgment was delayed pending resolution of these motions. Please submit order and judgment in conformity with the foregoing.
NOTES
[1] The car was too low for normal towing and required special equipment to get it to a repair shop when it broke down on the road.
[2] Subject to the sales section of the Commercial Code, and to the strict liability cases emanating from Henningsen v. Bloomfield Motors, 32 N.J. 358 (1960).