779 A.2d 1078

DANIALIE FERTILE, AN INFANT, BY HER GUARDIAN AD LI-
TEM, MARLENE FERTILE, MARLENE FERTILE, INDIVIDU-
ALLY, AND ERNST FERTILE, PLAINTIFFS–APPELLANTS, v.
ST. MICHAEL'S MEDICAL CENTER AND DR. ANGELA BUON-
TEMPO, DEFENDANTS–RESPONDENTS,DR. MICHAEL DO-
BRANSKY, CHARLES OZOARU, M.D., JOHN DOE, M.D. A–Z
(SAID NAMES BEING FICTITIOUS AND UNKNOWN) AND
JANE ROE, R.N. A–Z (SAID NAMES BEING FICTITIOUS AND
UNKNOWN), DEFENDANTS.

Argued April 30, 2001—Decided July 25, 2001.

482

484

*Cynthia A. Matheke* argued the cause for appellants (*Lum, Danzis, Drasco, Positan & Kleinberg*, attorneys; *Ms. Matheke* and *Dennis J. Drasco*, of counsel; *Kevin J. O'Connor*, on the brief).

*George J. Kenny* argued the cause for respondents (*Connell Foley*, attorneys).

The opinion of the court was delivered by

LONG, J.

The core issues presented on this appeal are rather straightforward: in the face of a concededly excessive damages award, when is the remedy of a new damages trial conditioned on plaintiffs' acceptance of a remittitur order appropriate; when is a new trial on all issues mandated; and by what standard is the amount of a remittitur order to be assessed?

I

On April 4, 1996, plaintiffs, Danialie Fertile, an infant by her guardian ad litem, Marlene Fertile, and Marlene Fertile, individually, (collectively, plaintiffs) filed a complaint against Dr. Angela Buontempo and St. Michael's Medical Center (collectively, defendants).[1] The complaint alleged that Danialie was severely injured as a result of Dr. Buontempo's malpractice and that Mrs. Fertile suffered severe emotional distress as a result. The gravamen of the complaint, as elucidated in discovery, was that Dr. Buontempo delivered Danialie vaginally when a caesarean (c-section) section was indicated.

A five day trial ensued at which the following evidence was introduced. On June 24, 1994, Mrs. Fertile was admitted to St. Michael's Medical Center in the early morning hours experiencing labor. At approximately 6:45 p.m., Dr. Cecil Holgado, a second-year resident, examined Mrs. Fertile and found her labor progressing satisfactorily. At his 9 p.m. examination, Dr. Holgado observed that Mrs. Fertile's cervix had stopped dilating, probably because of fetal pelvic disproportion, a condition in which the mother's pelvis cannot accommodate the size of the baby. Because the baby showed no signs of distress, Dr. Holgado recommended to Dr. Debra Rosenzweig, the attending physician, that Mrs. Fertile deliver by c-section. At approximately 9:15 p.m., Dr. Holgado asked Dr. Buontempo (another second-year resident) to

---

[1] The complaint of Ernst Fertile, Danialie's father, was dismissed as were all claims against Drs. Michael Dobransky and Charles Ozoaru.

follow Mrs. Fertile while he performed a c-section on another patient. Dr. Holgado advised Dr. Buontempo of his plans to perform a c-section on Mrs. Fertile.

After speaking to Dr. Holgado, Dr. Buontempo reviewed Mrs. Fertile's charts. At the time, Mrs. Fertile was connected to a fetal monitor that followed the baby's heart rate and assessed the intensity of Mrs. Fertile's labor contractions, recording both on fetal monitoring strips. Dr. Buontempo testified that the fetal monitor revealed prolonged reduced heart rate and beat-to-beat variability evidencing an impaired oxygen supply. At 9:40 p.m., because Mrs. Fertile was fully dilated and the baby's head was at the vaginal opening, Dr. Buontempo concluded that a caesarian section was no longer an appropriate option and that the baby had to be delivered vaginally. Accordingly, she sent a nurse to the operating room to inform Dr. Rosenzweig, who along with Dr. Holgado, was engaged in another delivery.

Dr. Buontempo summoned assistance. She recognized the potential that Danialie would be a large baby, given Mrs. Fertile's obesity and her substantial weight gain during pregnancy. Such large babies present a risk of shoulder dystocia, a condition that occurs when the baby's shoulder is stuck against the mother's pubic bone and obstructed in its passage from the vagina.

Danialie was large, and her shoulder was wedged behind Mrs. Fertile's pubic bone. Dr. Buontempo freed the baby by changing Mrs. Fertile's position, pressing on her pubic bone, and enlarging the surgical incision to expand her vagina. In the course of her birth, Danialie was injured, resulting in an atrophied and partially paralyzed arm.

Both plaintiffs and defendants presented expert testimony. Briefly, plaintiffs' expert, Dr. Stephen Leviss, testified that by delivering Danialie vaginally Dr. Buontempo deviated from acceptable standards. According to Dr. Leviss, the length of the labor (18 hours) and the size and position of the baby required a c-section and nothing in the fetal monitor tracing compelled a different result. Indeed, Dr. Leviss stated that the changes in

fetal heart rate revealed on the monitoring strips just prior to delivery resulted from the pressure Dr. Buontempo was exerting in attempting to deliver Danialie vaginally. Dr. Leviss concluded that Dr. Buontempo should have anticipated shoulder dystocia and that a properly performed c-section would not only have been less risky but also would have avoided Danialie's injuries.

Dr. Sidney Wilchins, defendants' expert obstetrician, agreed that because labor was not progressing at 9:00 p.m., the earlier decision to deliver Danialie by c-section was appropriate. However, he stated that once Mrs. Fertile's cervix had fully dilated and Danialie had begun to move through the birth canal, the necessity for a surgical delivery was eliminated. Dr. Wilchins interpreted the fetal monitor strips to reveal that the baby was experiencing an environmental insult that caused her heart rate to change and that she was incapable of overcoming the insult to return to a normal heart rate. That environmental insult could include such things as compression of the umbilical cord or the baby's head. In the face of fetal compromise, Dr. Wilchins testified that the physician's first obligation is to attempt to correct the situation and, if those attempts do not relieve the fetal distress, to deliver the baby as quickly and expeditiously as possible.

Dr. Wilchins said that by 9:45 p.m. the hospital record indicated that Danialie's head had reached the vaginal opening and that Dr. Buontempo acted "by the book" in proceeding to deliver Danialie vaginally. Defendants' second expert, Dr. Richard Luciani, essentially supported the conclusions of Dr. Wilchins.

A pediatric neurologist, Dr. Daniel Adler, testified for plaintiffs that as a result of traction on her head during birth Danialie suffered a brachial plexus injury, paralyzing some of her arm muscles and weakening others, resulting in a limited range of right arm motion. She is unable to move her right hand, thumb or fingers but can place a light object in her right hand and hold it there; her condition will not improve.

Danialie has seen various specialists and has undergone therapy for her arm. According to her mother, Danialie's arm has never

moved. A five year old kindergartner at the time of trial, Danialie is disappointed and frustrated by her disability. Mrs. Fertile testified that Danialie needs assistance with tasks that would ordinarily require the use of two hands, such as washing herself and combing her hair. Her father attested that Danialie requires assistance in engaging in the tasks of daily living. Although she is doing well in school she has difficulty with writing. The jury was shown a videotape of Danialie performing her daily activities, that was entitled "Day in the Life of Danialie Fertile." That videotape showed the extent of Danialie's impairment.

A social worker testified that Danialie is bright, self-confident, exceptionally well spoken in both French and English, but requires more opportunities for adaptation and rehabilitation. She recommended counseling and education for both Danialie and her parents to help them understand Danialie's development and to encourage them to properly impose discipline and normal limitations.

A career counselor testified for plaintiffs that, in her opinion, Danialie would have serious limitations as an adult because most of the fastest-growing job fields require two hands. Assuming that Danialie completed high school, the counselor opined that, with only one hand, any job would be frustrating. Moreover, even if Danialie completed additional education, she still would be unable to perform required tasks in a field such as medicine. The counselor added that a disabled person such as Danialie is more likely to encounter discrimination in hiring due to the perception of reduced productivity.

Defendants do not contest that Danialie suffered a brachial plexus injury, but disagree concerning its effects. Defendants' expert in rehabilitation testified that although Danialie has limitations imposed by her arm, she is intellectually, socially, and physically able to attend regular school classes and that nothing suggests that she could not graduate from high school or pursue higher education to qualify her for a professional position. He predicted no income loss as a result of her disability.

A jury awarded Danialie damages in the amount of $15 million and Mrs. Fertile damages in the amount of $3 million. Defendants filed a motion for a new trial or, in the alternative, a remittitur. The trial court denied a new trial concluding that no trial error had occurred. However, stating that the verdict "took my breath away," the court concluded that it was excessive and remitted $10 million of the $15 million dollar award to Danialie and all but $250,000 of the award to Mrs. Fertile, on the condition that plaintiffs accept that amount. Otherwise, defendants would be entitled to a new damages trial. Plaintiffs agreed to the remittitur order.

Defendants appealed, arguing entitlement to a new trial on all issues. They based their claim on three trial errors bearing on liability: that the trial court erred in excluding certain testimony of Dr. Rosenzweig; that a prejudicial comment by plaintiffs' expert, Dr. Stephen Leviss, about Dr. Buontempo's mismanagement of the dystocia warranted a mistrial; and that improper comments in plaintiffs' counsel's summation skewed the jury verdict. Defendants also argued that Mrs. Fertile's emotional distress claim should not have been submitted to the jury; that the liability verdict was against the weight of the evidence; that the mere quantum of damages awarded warranted a new trial on all issues; or in the alternative, that the remittitur amount was excessive. Plaintiffs cross-appealed, arguing that the remittitur should not have been granted at all and that the original damage award to Danialie was not excessive in light of her injuries.

The Appellate Division ruled that Mrs. Fertile's emotional distress claim was insufficient as a matter of law under *Carey v. Lovett*, 132 *N.J.* 44, 58, 622 *A.*2d 1279 (1993), and should have been dismissed prior to submission of the case to the jury. In addition, it found that certain comments in plaintiffs' counsel's summation constituted plain error, clearly capable of producing an unjust result. The panel concluded that the "grossly excessive" verdict was indicative of the prejudicial effects of the misstatements and remanded the case for a new trial on all issues regarding Danialie.

That ruling made it unnecessary for the court to address any of defendants' other claims of trial error.

Plaintiffs filed a petition for certification challenging that portion of the Appellate Division judgment that remanded the case for a new trial on all issues. Plaintiffs did not challenge the vacation of the verdict in favor of Mrs. Fertile or the determination that the verdict in favor of Danialie was excessive. Defendants did not file a protective cross-petition pursuant to *Rule* 2:12–11. We granted certification. 165 *N.J.* 679, 762 *A.*2d 659 (2000). The only question properly before us is whether defendants are entitled to a new trial on all issues.

## II

Plaintiffs argue that there was no trial error in this case; that the jury's finding of liability was not tainted by the concededly excessive damages verdict; and that the remittitur order should stand. Defendants counter that the summation comments by plaintiffs' lawyer were "plain error"; that that error, coupled with the gross excessiveness of the verdict, bespoke passion and prejudice, warranting a new trial on all issues; that the size of the verdict alone requires a new trial on all issues; and alternatively, that the remitted amount is still too high.

## III

*Rule* 4:49–1 prescribes the standard applicable to a motion for a new trial:

A new trial may be granted . . . . if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law.

[*Rule* 4:49–1(a).]

Once the trial court determines that a "manifest denial of justice" has occurred, *Baxter v. Fairmont Food,* 74 *N.J.* 588, 597–98, 379 *A.*2d 225 (1977), a new trial is warranted. The scope of the new trial depends on the nature of the injustice. Where trial error affecting liability occurs, the new trial will encompass all

issues. *See Carey, supra,* 132 *N.J.* at 63, 68, 70, 622 *A.*2d 1279 (verdict required new trial on liability and damages where it resulted from trial court's obvious impermissible bias toward plaintiffs throughout trial). Where the quantum of damages is the sole source of the court's determination that a denial of justice has taken place, other remedies are available including remittitur and additur [2]. *Velop, Inc. v. Kaplan,* 301 *N.J.Super.* 32, 42, 62–64, 693 *A.*2d 917 (App.Div.1997) (allowing plaintiff to accept remittitur or submit to new damages trial); *Bishop v. Harski,* 191 *N.J.Super.* 109, 112–114, 465 *A.*2d 577 (Law Div.1983) (allowing defendant to submit to additur or face new damages trial).

Because it is conceded that the damages award in favor of Danialie was excessive, our focus is on remittitur. Remittitur "describes the power of a court upon a motion for a new trial due to excessive damages rendered by a jury to require the plaintiff to consent to a decrease in the award to a specified amount as a condition for denial of the motion." Rayburn, *supra,* 43 *Miss. L.J.* at 107. In other words, remittitur denies a defendant a new trial if a plaintiff consents to a specified reduction in the jury award. *Henker v. Preybylowski,* 216 *N.J.Super.* 513, 516, 524 *A.*2d 455 (App.Div.1987).

Remittitur is designed to bring excessive damages awarded by a jury to the level that the court knows is within the limits of a proper verdict and thereby avoid the necessity of a new trial. Rayburn, *supra,* 43 *Miss. L.J.* at 107. Remittitur has long been employed by courts and legislatures to eliminate retrials for excessive verdicts. Comment, *Correction of Damage Verdicts by Remittitur and Additur,* 44 *Yale L.J.* 318 (1934). In fact, the practice of remittitur began to take hold in America in the

---

[2] Additur refers to "[t]he power of a court, on motion for a new trial due to inadequate damages rendered by jury verdict, to require the defendant to consent to an increase to a stipulated amount of the award as a condition for denial of the motion for a new trial. . . ." S.T. Rayburn, *Statutory Authorization of Additur and Remittitur,* 43 *Miss. L.J.* 107 (1972).

nineteenth century. By the latter half of the 1800's most state and federal courts accepted the doctrine. David Fink, *Best v. Taylor Machine Works, The Remittitur Doctrine, and the Implications for Tort Reform,* 94 *N.W. U.L.Rev.* 227, 234 (1999). Remittitur was formally recognized by the United States Supreme Court in 1886 in *Northern Pacific R.R. v. Herbert,* 116 *U.S.* 642, 646, 6 *S.Ct.* 590, 592, 29 *L.Ed.* 755, 758 (1886). *Ibid.* Remittitur has been attacked as an unconstitutional infringement on the guarantee of a trial by jury. However, the United States Supreme Court in *Dimick v. Schiedt,* 293 *U.S.* 474, 484 486, 55 *S.Ct.* 296, 300–301 79 *L.Ed.* 603, 610–611 (1935), recognized remittitur, although disapproving additur, the difference being that the former is a calculation within the jury's verdict whereas the latter is not.

Remittitur also has a long history in New Jersey. *Baxter v. Fairmont Food Co., supra,* 74 *N.J.* 588, 595, 379 *A.2d* 225 (1977) (stating "[w]e have no misgivings about the remittitur practice, long in effect in [New Jersey.]"); *Ekalo v. Constructive Serv. Corp. of Am.,* 46 *N.J.* 82, 93, 215 *A.2d* 1 (1965)("[T]here is of course no question as to the power of New Jersey's trial and appellate courts to exercise [the power of remittitur.]"). *Fisch v. Manger,* 24 *N.J.* 66, 76, 130 *A.2d* 815 (1957) ("The remittitur practice has been recognized in New Jersey since early days.")

■ Because the use of remittitur avoids the unnecessary expense and delay of a new trial, when confronted with excessive verdicts New Jersey courts should, if possible, resort to an order of remittitur. *Caldwell v. Haynes,* 136 *N.J.* 422, 443, 643 *A.2d* 564 (1994); *Baxter, supra,* 74 *N.J.* at 595, 379 *A.2d* 225; *Fritsche v. Westinghouse Electric Corp.,* 55 *N.J.* 322, 330–31, 261 *A.2d* 657 (1970). That is the action the trial court took in this case, and that the Appellate Division set aside.

## IV

■ We turn first to plaintiffs' claim that the Appellate Division erred in concluding that the excessive damages verdict was indica-

tive of the prejudicial effect of trial error. Defendants challenged the following comments in plaintiffs' counsel's summation as leaving the jury with a misimpression of the evidence:

Those decelerations are a smoke screen and a—and one that has such appeal that I ask you to consider it carefully. But I also ask you to consider those—compare the decelerations, not numbered, not identified, not listed in Dr. Buontempo's post note, post-event note that she was instructed to write by Dr. Rosenzweig after, *according to her testimony, Dr. Rosenzweig said didn't you know we wanted to do a section, please write it up. And, ladies and gentlemen, I must submit to you that there was never any testimony from Dr. Rosenzweig, as was alleged in opening statement, that Dr. Rosenzweig told Dr. Buontempo she did the right thing.*

\* \* \*

And then count those seconds up and ask if you, knowing what you now know—as I indicated from the beginning what you're going to know about birthing and so on, that that is such an ominous sign, or is it the only exit way out of this case for the defendants because *it's clear from Dr. Rosenzweig's testimony that she came out of there preparing to section this woman and found a baby whose arm was hanging like this and said nothing more except document it for the record,* an hour later.

No objection was advanced by defendants when the comments were made. Thus the standard by which they are to be tested is that of plain error. *Rule* 1:7–2. Under that standard, the issue is whether the comments had the "clear capacity for producing an unjust result." *State v. Melvin,* 65 *N.J.* 1, 18, 319 *A.*2d 450 (1974); *Rule* 2:10–2. The Appellate Division held that the comments met the plain error standard:

The relevant testimony does not justify the comment that following Dr. Rosenzweig's completion of the other caesarian section Dr. Rosenzweig admonished Dr. Buontempo saying, "Didn't you know we wanted to do a section, please write it up." Nothing in the record supports a statement that Dr. Rosenzweig made any observation regarding the planned caesarean delivery. To the contrary, Dr. Rosenzweig maintained that she had no recollection of Marlene's labor or delivery other than instructing Dr. Buontempo to "write a chronology of the course of the delivery" in light of the complications associated with Danialie's birth. Dr. Buontempo did not testify to the contrary. Nor was there any testimony that Dr. Rosenzweig saw Danialie contemporaneously with her post-delivery conference with Dr. Buontempo or that, if she had seen Danialie, Dr. Rosenzweig would have observed her "arm hanging like this."

In the context of this close case on liability these misstatements as to Dr. Rosenzweig's testimony had great potential to mislead and inflame the jury because they suggested that Dr. Rosenzweig, Dr. Buontempo's superior, disagreed with the decision to carry out a vaginal delivery. Moreover, the representation that Dr. Rosenzweig admonished Dr. Buontempo supported plaintiffs' theory that

Dr. Buontempo committed malpractice in not carrying out the previously planned caesarian section.

[*Fertile v. St. Michael's Medical Center,* 334 *N.J.Super.* 43, 61, 756 *A.*2d 1037 (App.Div.2000).]

We disagree with that analysis.

In his opening statement, defense counsel told the jury that

Dr. Buontempo sent a nurse to Dr. Rosenzweig, who was doing the other c-section, and told her what had occurred and what Dr. Buontempo's plan was and what she was going to do. And, in fact, she talked with Dr. Rosenzweig after this occurred, and Dr. Rosenzweig did not disagree with her at all.

By that statement, counsel left the jury with the impression that Dr. Rosenzweig concurred in Dr. Buontempo's handling of the case. When he tried to elicit that conclusion from Dr. Rosenzweig, however, the trial court properly precluded her from offering an opinion regarding Dr. Buontempo's conduct. Dr. Rosenzweig was not entitled to give either a fact opinion regarding matters that took place out of her presence or an expert opinion for which she was not proffered as a witness. Thus, on that point, it was fair comment in summation for plaintiffs' counsel to underscore that defense counsel's statement, volunteered on opening, that Dr. Rosenzweig "agreed" with Dr. Buontempo's handling of Mrs. Fertile's delivery was not supported by the evidence.

■ Other than instructing Dr. Buontempo to write a chronology of the course of the delivery in light of the complications, Dr. Rosenzweig did not recall Mrs. Fertile's labor or delivery. During cross-examination, Dr. Buontempo testified:

Q. Now doctor, you got no answer from Dr. Rosenzweig when you sent in word that there was going to be a delivery.

A. No.

Q. You got—that's correct, you got no answer.

A. I didn't get any answer.

Q. And did Dr. Rosenzweig indicate to you after—ask you after the delivery whether you were aware that they were planning to do a caesarian section?

A. Yes.

Although Dr. Rosenzweig did not say to Dr. Buontempo "please write it up because you performed a vaginal delivery in contravention of the c-section that had been anticipated" (the inference

plaintiffs obviously wanted drawn), it is uncontroverted that Dr. Rosenzweig asked Dr. Buontempo to "please write it up" and additionally inquired of Dr. Buontempo whether she was "aware" that they had planned to do a c-section. In light of that evidence, the inference that there was a connection between the statements was a legitimate one and plaintiffs' summation was not erroneous on that point.

Moreover, it cannot be disputed that Dr. Rosenzweig asked Dr. Buontempo to document her conduct for the record because of the complications in the delivery. Dr. Rosenzweig testified to that directly. Although Dr. Rosenzweig did not say specifically that she contemporaneously saw Danialie post-delivery, she did testify that she instructed Dr. Buontempo to document the delivery after she "walked into" the labor room and it became clear that there were "complications." It is true that there is no testimony out of Dr. Rosenzweig's mouth that she directly observed Danialie's injury. However, her presence in the labor room, her acknowledgement of complications, and the testimony from Mr. Fertile that Danialie's injury was visible and that her arm was limp from the moment of birth, are persuasive circumstantial evidence for the inference that Dr. Rosenzweig saw her when she walked into the labor room.

In short, given the latitude counsel are afforded in summation, *State v. Bogen*, 13 *N.J.* 137, 140–141, 98 *A.*2d 295, *cert. denied,* 346 *U.S.* 825, 74 *S.Ct.* 44, 98 *L.Ed.* 350 (1953), the statements at issue were not unjustified. In that connection, we view the failure of defendants' experienced counsel to place on the record any objection to the summation as speaking volumes about the accuracy of what was said. *State v. Wilson,* 57 *N.J.* 39, 51, 269 *A.*2d 153 (1970). We presume that when a lawyer observes an adversary's summation, and concludes that the gist of the evidence has been unfairly characterized, an objection will be advanced.

We turn finally to the three issues raised by defendants in the Appellate Division briefs but not directly confronted in that court's opinion. Although defendants raised those issues at oral

argument here, in the absence of a protective cross-petition they are not properly before us. However, in the interest of completeness we choose to address them. Regarding the weight of the evidence, this was a hotly contested case involving a proverbial battle of experts. Although the verdict could have gone either way, there was evidence in the record that, if believed by the jury, amply supported the liability determination against defendants. Further, as we have indicated, the trial court's refusal to allow Dr. Rosenzweig to render an opinion regarding Dr. Buontempo's conduct was entirely proper given that she was not present during the delivery of Mrs. Fertile and had not been proffered as an expert witness. Finally, regarding Dr. Leviss's statement that Dr. Buontempo mismanaged the dystocia, the trial court quickly and forcefully gave a fully remedial curative instruction. In sum, no error, let alone plain error, occurred during the trial of this case.

We thus reverse the Appellate Division's determination that a new trial on all issues is required because the excessive verdict resulted from the prejudicial effect of trial error.

V

We turn next to defendants' contention that the decision of the Appellate Division can be sustained on another basis: that under *Taweel v. Starn's Shoprite Supermarket*, 58 *N.J.* 227, 231, 276 *A.2d* 861 (1971) the gross "excessiveness" of the verdict, standing alone, compels a new trial on all issues.

In *Taweel*, this Court stated:

When there is adequate support for the jury's finding on liability and it appears only that the damages awarded were excessive, the remittitur device may be used and its use is encouraged to avoid a new trial. *Fritsche v. Westinghouse Electric Corp.*, 55 *N.J.* 322, 330, 331, 261 *A.2d* 657 (1970). The term is used to describe an order denying defendant's application for a new trial on condition that the plaintiff consent to a specified reduction in the jury's award. *Fisch v. Manger*, 24 *N.J.* 66, 72, 130 *A.2d* 815 (1957). It may be employed only in cases where, if the plaintiff declines the reduction, the separate issue of liability having been clearly and properly decided, he must submit to a new trial as to damages. *If, however, the award of damages is so grossly excessive as to demonstrate prejudice, partiality or*

*passion and thus to generate the feeling that the entire verdict was tainted, a remittitur is improper. The correct procedure in such a case is an order for a new trial on all issues.*

[*Taweel, supra,* 58 *N.J.* at 231, 276 *A.*2d 861 (emphasis added).]

Defendants' reliance on *Taweel* is misplaced. First, the cited language is dictum insofar as the Court in *Taweel* ultimately held that that verdict was not excessive and reinstated it. *Id.* at 236–37, 276 *A.*2d 861. Likewise, although the underscored language in *Taweel* has been cited in our reported civil case law a number of times, not one single post-*Taweel* case has ever ordered a new trial on all issues based solely on a grossly excessive damages award. Several cases ordered a new liability trial, but only did so because of trial error or attorney misconduct in addition to the excessiveness of the damages verdict.[3] A number of the cases approved remittitur or additur[4], still others ordered a new damages trial[5], and many simply left the original damages verdict undisturbed[6].

---

[3] *Carey, supra,* 132 *N.J.* at 63, 68–70, 622 *A.*2d 1279 (1993); *Von Borstel v. Campan,* 255 *N.J.Super.* 24, 30–32, 604 *A.*2d 614 (App.Div.1992); *Grassis v. Johns–Manville Corp.,* 248 *N.J.Super.* 446, 450, 452–57, 591 *A.*2d 671 (App.Div. 1991); *McDonough v. Jorda,* 214 *N.J.Super.* 338, 346–48, 519 *A.*2d 874 (App.Div. 1986). *See also Sherry v. Buonansonti,* 287 *N.J.Super.* 518, 523, 671 *A.*2d 606 (App.Div.1996) (although dismissing on verbal threshold grounds, recognizing that excessiveness of jury verdict combined with trial error would justify new trial on all issues).

[4] *Inter Medical Supplies Ltd. v. EBI Med. Systems, Inc.,* 975 *F.Supp.* 681, 701–02(D.N.J.1997); *Iacano v. St. Peter's Med. Ctr.,* 334 *N.J.Super.* 547, 554–556, 760 *A.*2d 348 (App.Div.2000); *Velop, supra,* 301 *N.J.Super.* at 42, 62–64, 693 *A.*2d 917 (App.Div.1997); *Wolfe v. Chateau Renaissance,* 141 *N.J.Super.* 59,66, 357 *A.*2d 282 (App.Div.1976); *Bishop, supra,* 191 *N.J.Super.* at 112–114, 465 *A.*2d 577 (Law Div.1983).

[5] *Bell Atl. Network Serv., Inc. v. P.M. Video Corp.,* 322 *N.J.Super.* 74, 115–116, 730 *A.*2d 406 (App.Div.1999); *Brown v. Kennedy Mem'l Hosp. Univ. Med. Ctr.,* 312 *N.J.Super.* 579, 589–93, 711 *A.*2d 1370 (App.Div.1998); *Maiorino v. Schering–Plough Corp.,* 302 *N.J.Super.* 323, 356, 358, 695 *A.*2d 353 (App.Div.1997); *Jadlowski v. Owens–Corning Fiberglas Corp.,* 283 *N.J.Super.* 199, 213–14, 222, 661 *A.*2d 814 (App.Div.1995), *certif. denied,* 143 *N.J.* 326, 670 A.2d 1066 (1996); *Caldwell v. Haynes,* 136 *N.J.* 422, 443, 643 *A.*2d 564 (1994); *Tronolone v. Palmer,* 224 *N.J.Super.* 92, 104, 539 *A.*2d 1224 (App.Div.1988); *Jackson v. Consolidated Rail Corp.,* 223 *N.J.Super.* 467, 479, 483–85, 538 *A.*2d 1310 (App.Div.1988);

The refusal of any trial or appellate court to invalidate an otherwise justifiable liability verdict based solely on the award of grossly excessive damages in the thirty years since *Taweel* is not a coincidence. In our view, it is an implicit repudiation of the essentially standardless exercise of distinguishing between excessive and grossly excessive damages awards to determine whether a liability verdict has been impaired by passion, prejudice, or bias. Given that excessive damages in themselves must shock the judicial conscience, *Baxter, supra,* 74 *N.J.* at 595, 603, 604, 379 *A.*2d 225, there is simply no principled distinction between those damages and grossly excessive ones. Moreover, there is no logical reason why the size of a damages award, standing alone, should invalidate an otherwise sound liability verdict. A "feeling" that

---

*Henker v. Preybylowski,* 216 *N.J.Super.* 513, 516–518, 524 *A.*2d 455 (App.Div. 1987); *Law v. Newark Bd. of Ed.,* 175 *N.J.Super.* 26, 37–39, 417 *A.*2d 560 (App.Div.1980); *Correa v. Maggiore,* 196 *N.J.Super.* 273, 283, 286, 482 *A.*2d 192 (App.Div.1978); *Lemaldi v. De Tomaso of Am., Inc.,* 156 *N.J.Super.* 441, 450, 383 *A.*2d 1220 (Law Div.1978).

[6] *McKenna v. Pac. Rail Serv.,* 817 *F.Supp.* 498, 503, 511–12, 514–515, 518–19 (D.N.J.1993); *Carrino v. Novotny,* 78 *N.J.* 355, 366–67, 396 *A.*2d 561 (1979); *Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 603, 379 *A.*2d 225 (1977); *Leimgruber v. Claridge Assoc. Ltd.,* 73 *N.J.* 450, 459, 461, 375 *A.*2d 652 (1977); *Sweeney v. Pruyne,* 67 *N.J.* 314, 315, 338 *A.*2d 193 (1975); *Rose v. Port of N.Y. Auth.,* 61 *N.J.* 129, 140, 293 *A.*2d 371 (1972); *Dombroski v. City of Atlantic City,* 308 *N.J.Super.* 459, 473–74, 706 *A.*2d 242 (App.Div.1998); *Adams v. Cooper Hosp.,* 295 *N.J.Super.* 5,14, 684 *A.*2d 506 (App.Div.1996), *certif. denied,* 148 *N.J.* 463, 690 *A.*2d 610 (1997); *Crego v. Carp,* 295 *N.J.Super.* 565, 577–78, 685 *A.*2d 950 (App.Div.1996); *Monheit v. Rottenberg,* 295 *N.J.Super.* 320, 327–28, 685 *A.*2d 32 (App.Div.1996); *Nowacki v. Comm. Med. Ctr.,* 279 *N.J.Super.* 276, 292–93, 652 *A.*2d 758 (App.Div. 1995); *Goss v. Am. Cyanamid, Co.,* 278 *N.J.Super.* 227, 239, 242, 245, 650 *A.*2d 1001 (App.Div.1994); *Glowacki v. Underwood Mem'l Hosp.,* 270 *N.J.Super.* 1, 14, 636 *A.*2d 527 (App.Div.1994); *Lesniak by Lesniak v. Bergen County,* 219 *N.J.Super.* 468, 477, 530 *A.*2d 816 (App.Div.1987), *reversed and remanded for new damages trial by,* 117 *N.J.* 12, 563 *A.*2d 795 (1989); *Tonsberg v. VIP Coach Lines, Inc.,* 216 *N.J.Super.* 522, 531–32, 524 *A.*2d 460 (App.Div.1987); *Amaru v. Stratton,* 209 *N.J.Super.* 1, 20 22, 506 *A.*2d 1225 (App.Div.1985); *Ackerman v. Kramer Chemical Co.,* 158 *N.J.Super.* 128, 130, 385 *A.*2d 898 (App.Div.1978); *Zalewski v. Gallagher,* 150 *N.J.Super.* 360, 371, 375 *A.*2d 1195 (App.Div.1977).

something is amiss is an inadequate basis to upend an otherwise untainted verdict.

To the extent that *Taweel* suggests the contrary, it is disapproved. Our guiding principle is that passion, prejudice, or bias warranting a new trial on liability generally cannot be established merely by the excessiveness of a damages award, regardless of its size. *See Brodbeck v. N.R.A.*, No. CIV. A. 98–5361, 1999 *WL* 722815, at *4 (E.D.Pa. Sept.14, 1999) (citing *Dunn v. HOVIC*, 1 *F*.3d 1371, 1383 (3d Cir.1993)), (for proposition that no amount of damages is per se proof of passion, prejudice or bias warranting new liability trial); *Callahan v. Cardinal Glennon Hosp.*, 863 *S.W.*2d 852, 872 (Mo.1993) (size of verdict alone will not establish passion and prejudice by jury, and some other error must be shown to require new trial on all issues). To justify a new trial on all issues, what is required is trial error, attorney misconduct or some other indicia of bias, passion or prejudice, impacting on the liability verdict. In the absence of such indicia, a trial court faced with an excessive damages award can only order a new damages trial, whether or not conditioned on remittitur.[7] Defendants therefore are not entitled to a new trial on all issues based on the size of the damages award.

## VI

We turn finally to defendants' contention that the remitted verdict is still excessive. Although technically that issue was not properly preserved by a cross-petition, we choose to address it because it resonates throughout the case.

The standard applicable to such a claim is similar to that governing a new trial. *Baxter, supra,* 74 *N.J.* at 596, 379 *A.*2d 225

---

[7] Obviously, that governing principle must yield in cases where the issue of damages for some reason is so interrelated with liability that one cannot be retried alone without working an injustice. *See Ahn v. Kim,* 145 *N.J.* 423, 434–435, 678 *A.*2d 1073 (1996) (holding that whether issues are separable so as to warrant partial retrial is fact sensitive).

(1977); *Rule* 4:49–1. Obviously, assessing the amount of a remittitur is a slightly more complicated function than merely determining entitlement to a new damages trial. It not only involves the conclusion that the damages award cannot stand because it constitutes a manifest denial of justice but also a determination that the remitted amount is what a reasonable jury, properly instructed, would have awarded.

Different approaches have developed for determining the proper amount of a remittitur order: one is to award the lowest amount supported by the record, *Meissner v. Papas*, 35 *F.Supp.* 676, 677 (E.D.Wis.1940), *modified on other grounds*, 124 *F*.2d 720 (7th Cir.1941); a second is to award the highest amount supported by the record, *Osburn v. Anchor Laboratories*, 825 *F*.2d 908, 919 (5th Cir.1987) *cert. denied* 485 *U.S.* 1009, 108 *S.Ct.* 1476, 99 *L.Ed.*2d 705 (1988); and a third is to award damages in between the highest and lowest amounts supported by the record, *Lanfranconi v. Tidewater Oil Co.*, 376 *F*.2d 91, 97 (2d Cir.), *cert. denied*, 389 *U.S.* 951, 88 *S.Ct.* 334, 19 *L.Ed.*2d 361 (1967). Because the process of remittitur is essentially to "lop-off" excess verdict amounts, *Dimick v. Schiedt, supra*, 293 *U.S.* at 486, 55 *S.Ct.* at 301, 79 *L.Ed.* at 611, and not to substitute the court's weighing and balancing for that of the jury, remitting the award to the highest figure that could be supported by the evidence is the most analytically solid approach. Indeed, commentators have concluded that such an approach "tampers least with the intentions of the jurors, who by implication wanted to fully compensate the plaintiffs . . . ." Irene Deaville Sann, *Remittiturs (and Additurs) in the Federal Courts: An Evaluation With Suggested Alternatives*, 38 *Case W. Res. L.Rev.* 157, 191 (1987/88); *Moore's Federal Practice*, § 59.26[4][b](3d ed.1997); *see also Slade v. Whitco Corp.*, 811 *F.Supp.* 71, 77 (N.D.N.Y.) (noting that, of the three alternative methods for computing remittitur, method that reduces verdict only to maximum that would be upheld by trial court if not excessive is least intrusive standard), *aff'd by*, 999 *F*.2d 537 (2d Cir.1993).

We have carefully reviewed this record in light of the aforementioned standards, and find no reason to interfere with the remittitur order. The trial court fully and carefully explained how it determined that the jury verdict was excessive and how it reached the remitted number. In so doing, it properly relied on the evidence it saw and heard. *Tronolone v. Palmer,* 224 *N.J.Super.* 92, 104, 539 *A.*2d 1224 (App.Div.1988). In addition, it based the decision on its own common knowledge, as well as its experience with other injury verdicts, and particularly on Danialie's extended life expectancy. The court stated:

When it comes to the dollar amount of the verdict and this becomes hard too and I direct the question am I constrained with what my responsibility is, is just to use my common knowledge experience and knowledge vis-a-vis one injury or do I do it in comparison to others, and I think what I have to do is do in the totality of the circumstances as what this means to a particular individual in a particular case.

What's devastating to one is so so to another. So, it has to be an individual situation. Certainly we know that we have, it's certainly no solace to the parents of this child that we have much more severely injured children with brain damage babies etc. It doesn't give any solace that, oh, well, it's only, you know a brachioplexis injury as opposed to a brain damage. That doesn't do the plaintiff in this case any good. But I have to look at it all around, the quality of life, and what's available there because as I say everybody is a little bit different.

\* \* \*

And I looked at that and I say that in good conscience I can't let the dollar amount stand and it's a hard place to put and I look at it all, yes, there is a young woman who certainly is precocious, is bright, intellectually has the world open to her, but yet there are still some everyday things that are going to cause some problems that you think very simply is how easy it is to do certain things that we take for granted for everyday with two arms that you can't do with only one. It is something that goes on and on and on, and I do have to consider the life expectancy overall. Remember we do have as of this time she was just short of five and the life expectancy of a little over 70, so you're talking 75 years and hopefully and god willing she'll have longevity longer than that because we know as we get older that it extends, but the jury looked at it from that point of view. In evaluating I've even watched her again today, a charming young lady but with a very noticeable injury that is not something that's going to take a discerning eye to see. It's something that is going to, you know, jump up and hit anybody who sees it. It is something that is going to if you don't need a psychiatrist or anybody on that basis to say that it's always to be some sort of a problem to someone to adapt with it and all, but in this court's opinion the 15 million dollars just is a bit of an overreach and somewhat interlaced with the motion.

The court ultimately concluded that $5,000,000 was an appropriate and just award, underscoring that Danialie's injury "is devastating and visible and with [her] for a lifetime." Having reviewed the trial record and the videotape, we cannot say that the court was wide of the mark or that the remittitur order constituted a manifest denial of justice.

### VII

The judgment of the Appellate Division is reversed insofar as it ordered a new trial on all issues relating to Danialie; the remittitur order of the trial court is reinstated with respect to Danialie; the remainder of the judgment of the Appellate Division is affirmed.

For reversal in part and affirmance in part—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, and ZAZZALI—5.