882 A.2d 410 (2005)
380 N.J. Super. 361
Matthew BORYSZEWSKI, an infant by his Guardian ad Litem, Witold BORYSZEWSKI
Brian Boryszewski, an infant by his Guardian ad Litem, Witold Boryszewski; Timothy Boryszewski, an infant by his Guardian ad Litem, Witold Boryszewski; and Witold Boryszewski, Individually and as Administrator of the Estate of Annette Boryszewski, PlaintiffsAppellants/Cross-Respondents,
v.
Cody M. BURKE, North End Mobil, Inc., Jeffrey H. Argast, Gazzani Motors, Inc., Bigelow Chrysler-Plymouth, and Mobil Oil Corporation, DefendantsCross-Respondents, and
Chrysler Corporation, DaimlerChrysler, Inc., DefendantRespondent/Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 11, 2005.
Decided September 27, 2005.
*413 Stuart M. Feinblatt, Newark, argued the cause for appellants/cross-respondents (Sills Cummis Radin Tischman Epstein & Gross, attorneys; Mr. Feinblatt, of counsel and, with Vincent R. Lodato and Eric I. Abraham, on the brief).
Richard J. Mirra, Edison, argued the cause for respondent/cross-appellant DaimlerChrysler Corporation (Hanlon Boglioli & Hanlon, attorneys; Mr. Mirra and Robert M. Hanlon, Jr., on the brief).
Gail E. Slaughter, Chatham, argued the cause for cross-respondent Mobil Oil Corporation (McCusker, Anselmi, Rosen, Carvelli & Walsh, attorneys; Joseph T. Walsh, III, and Ms. Slaughter, on the brief).
No brief was filed by any other party.
Before Judges KESTIN, ALLEY and FUENTES.
The opinion of the court was delivered by
KESTIN, P.J.A.D.
This case arises from a motor vehicle accident that resulted in the death of Annette Boryszewski while she was driving a minivan manufactured by defendant Chrysler Corporation, DaimlerChrysler, Inc. (Daimler). Before the initial trial of the matter, plaintiffs' claims against all defendants except Daimler were either settled or dismissed.
Against Daimler, plaintiffs had alleged a product liability cause of action based on a design-defect/"crashworthiness" theory. Those issues were initially presented to a judge and jury in a fourteen-day trial. The jury returned a verdict for plaintiffs, finding Daimler liable for a design defect in the vehicle decedent had been driving, and awarding damages totaling $20 million: $5 million in wrongful death damages and $5 million in emotional distress damages to each of decedent's three sons, who had been passengers in the vehicle at the time.
Thereafter, a hearing was held to approve the terms of the $2.8 million structured settlement between plaintiffs and the settling defendants as it affected the minor plaintiffs. After the trial court rendered an oral opinion approving the settlement, Daimler objected to it as void on public policy grounds. Following consideration of the parties' positions in writing, the judge entered an order approving the settlement.
Daimler had also moved for judgment notwithstanding the verdict, a new trial, or remittitur. The trial judge granted a new trial on the issue of damages only, and denied all other aspects of Daimler's motion. His reasons were expressed in an oral opinion.
A second, nine-day trial on damages ensued. The jury awarded $800,000 in wrongful death damages, $25,000 in emotional distress damages to one of the children, and no emotional distress damages to the other two children. The trial court denied plaintiffs' motion for a new trial on damages.
Plaintiffs appeal from the trial court's order vacating the damages verdict in the first trial and ordering a second trial on damages. They also appeal from the judgment based upon the damages verdict in the second trial and the order denying their motion for a new trial on damages, asserting erroneous rulings by the second trial judge and deficiencies in his charge to the jury on the issue of emotional distress damages, and challenging the second damages verdict as against the weight of the evidence.
Daimler cross-appeals from the liability aspect of the judgment based upon the *414 first jury's verdict, asserting erroneous evidentiary rulings, as well as deficient jury instructions by the first trial judge as a result of his rejection of Daimler's request to charge on apportionment of fault among defendants. Daimler also argues that its motions for judgment, judgment notwithstanding the verdict, and a new trial were erroneously denied; it contends that the verdict on liability was against the weight of the evidence; and it challenges the trial court's rejection of its argument that the settlement between plaintiffs and defendant Mobil Oil Corporation (Mobil) was void as against public policy.

I
The accident occurred at about 5:50 p.m. on August 5, 1998. Annette Boryszewski was driving her family's 1998 Plymouth Grand Voyager, a minivan, on Route 280 westbound in East Orange. Her three sons  Matthew, age fourteen; Brian, age eleven; and Timothy, age seven  were riding in the Voyager with her. Brian was in the front passenger seat, Matthew was seated in the second row behind the front passenger's seat, and Timothy was seated in the second row behind the driver.
At the same time, defendant Cody Burke was driving his Jeep Wrangler in the far left lane of Route 280 eastbound. The left front tire came off Burke's vehicle, bounced over the median divider, hit a vehicle on the westbound side of the highway, bounced again several times, and then crashed into the windshield and windshield header of the Boryszewski vehicle. The tire shattered the windshield and crushed the roof downward, fracturing Annette's skull and killing her.
A week before the accident, the tires on Burke's vehicle had been rotated at defendant Gazzani Motors, which leased space at the North End Mobil gas and service station in Bloomfield, operated by Jeffrey Argast, also named as defendants. A State Police investigation into the accident concluded that the mechanic who had rotated Burke's tires did not securely fasten the lug nuts on the front tires, causing the left front tire to come off.
After being struck by Burke's tire, the Boryszewski vehicle careened toward the center of the highway. As this occurred, Matthew arose from his seat and turned off the ignition. The minivan then came to a stop against the median divider of the highway.
Annette and the children were transported to the University of Medicine and Dentistry in Newark. Annette was pronounced dead due to blunt force trauma to her head caused by impact with the Voyager's roof. The boys suffered minor physical injuries.
Plaintiffs alleged a design defect with the Voyager, claiming it was not "crashworthy." Specifically, plaintiffs contended that the Voyager's windshield header lacked sufficient structural strength to protect its occupants from grievous injury or death in a reasonably foreseeable accident, such as the one that occurred here. Plaintiffs claimed Annette would not have died if the windshield header had been adequately designed.
The parties introduced contrapositive evidence on the design defect issue. Plaintiffs presented evidence from Gerald Steinberg, an expert in metallurgical testing and analysis; and from Erik Carlsson, an expert in automotive design and engineering, automotive safety standards, and accident reconstruction. Plaintiffs also introduced the deposition testimony of several Daimler employees who had been involved in the design and testing of the Voyager. Daimler offered evidence from Dr. Michelle Vogler, an expert in the fields of *415 metallurgy, design and evaluation of automobiles, and statistics.

II
We address, first, the liability questions raised in the cross-appeal. Daimler raises two issues in this connection: whether the first trial judge erred by admitting the testimony of Erik Carlsson, one of plaintiffs' experts; and whether the liability verdict was against the weight of the evidence.

A
Our review of the record discloses that, as a matter of weight, if all the expert testimony was admissible, there was ample evidence to support the jury's verdict on liability. We reject Daimler's weight-of-the-evidence arguments, which are essentially based upon its expert's testimony regarding the strength of the Voyager's roof system as a whole, with inadequate consideration for the countervailing testimony of plaintiffs' witnesses. The jury was entitled to reject Daimler's expert's opinions and credit plaintiffs' evidence to the contrary. See, e.g., Waterson v. Gen. Motors Corp., 111 N.J. 238, 248, 544 A.2d 357 (1988); Domurat v. Ciba Specialty Chems. Corp., 353 N.J.Super. 74, 90-91, 801 A.2d 423 (App.Div.), certif. denied, 175 N.J. 77, 812 A.2d 1110 (2002); Poliseno v. General Motors Corp., 328 N.J.Super. 41, 59, 744 A.2d 679; Amaru v. Stratton, 209 N.J.Super. 1, 20, 506 A.2d 1225 (App.Div. 1985); Ardis v. Reed, 86 N.J.Super. 323, 330-31, 206 A.2d 890 (App.Div.), aff'd o.b., 46 N.J. 1, 214 A.2d 313 (1965); State v. Scelfo, 58 N.J.Super. 472, 477-78, 156 A.2d 714 (App.Div.1959), certif. denied, 31 N.J. 555, 158 A.2d 454 (1960). Assuming the admissibility of all the expert testimony, there is ample evidentiary support in the record taken as a whole to support the jury's verdict on liability, see Carrino v. Novotny, 78 N.J. 355, 360, 396 A.2d 561 (1979)("a jury verdict, from the weight of the evidence standpoint, is impregnable unless so distorted and wrong ... as to manifest with utmost certainty a plain miscarriage of justice")(citing Baxter v. Fairmont Food Co., 74 N.J. 588, 379 A.2d 225 (1977)), and to justify the trial court's denial of Daimler's motions for a new trial or alternative relief following the first trial. See Dolson v. Anastasia, 55 N.J. 2, 6-9, 258 A.2d 706 (1969); see also Dolid v. Leatherkraft Corp., 39 N.J.Super. 194, 197, 120 A.2d 617 (App.Div.1956).

B
The focal issue on liability is, therefore, the admissibility of Carlsson's testimony. Daimler contends that the first trial judge erred by: (1) denying its motion in limine to bar Carlsson's testimony; (2) denying its motion to strike Carlsson's testimony from the record; and (3) denying its motion for a new trial based upon the allegedly erroneous admission of Carlsson's testimony. Daimler contends Carlsson's opinions were inadmissible because they were net opinions and because they differed from the opinions Carlsson gave in pretrial discovery. Daimler further contends that Carlsson's opinion regarding a "208 rollover test" was inadmissible because Carlsson misstated an issue of law  namely, the injury criteria for the 208 test which are set forth in the Code of Federal Regulations.
We need not burden this opinion with pointless exegesis. It suffices to say we reject Daimler's arguments in this regard as meritless.
In ruling upon Daimler's in limine motions, the first trial judge engaged in an exhaustive review of Carlsson's deposition testimony and expert report, and articulated the results of his evaluation on the *416 record. He determined that he could not rule on Daimler's motions in a vacuum, without hearing Carlsson's testimony in the context of the trial. That ruling was unremarkable.
Immediately after Carlsson concluded his testimony, Daimler moved to strike. The judge expressed concerns whether the opinions Carlsson expressed at trial were consistent with those he had given before trial. Moreover, the judge "believe[d] that Mr. Carlsson's testimony ... was vague, circuitous, [and] bordering on evasive." Nevertheless, the judge denied Daimler's motion to strike because those determinations were the province of the jury. He ruled that the opinions Carlsson had expressed at trial were not inadmissible net opinions, and that Daimler had had sufficient pretrial notice of them.
At the close of all evidence, Daimler made a motion for judgment under R. 4:40-1, which the court denied on the ground that the evidence was sufficient to support a judgment in plaintiffs' favor.
Daimler's post-trial motions for judgment notwithstanding the verdict, under R. 4:40-2, or, alternatively, for a new trial, based upon the alleged erroneous admission of Carlsson's testimony, were also denied. The judge again evaluated Carlsson's trial opinions as consistent with the opinions he had expressed in pretrial discovery. Therefore, the judge concluded, there was no surprise or prejudice to Daimler warranting the exclusion of Carlsson's testimony. The judge also determined, once again, that Carlsson's views were not net opinions, that there was sufficient factual basis for Carlsson's opinions relating to the 208 rollover test, and that there was no basis for challenging those opinions based upon the asserted unreasonableness or untrustworthiness of the testing methodology or analysis employed. Finally, the judge concluded that the jury's finding of liability was consistent with the evidence adduced at trial.
We are in substantial agreement with the trial judge's reasoning and conclusions in each respect. Daimler cannot validly use the post-trial motions before the trial court or the arguments made on appeal as surrogates for its duty to present the jury with evidence that persuasively countervailed plaintiffs' proofs.

III
Although we have determined that Daimler is not entitled to a new trial on the product liability question, whether Daimler was entitled to the charge it requested on apportionment of liability among the various defendants is another question entirely.

A
During charge conferences, Daimler requested that the jury be instructed to consider apportionment of fault between Daimler and the codefendants who had settled before trial. Daimler contended that the settling codefendants who caused the accident should bear some liability for Annette's death.
Plaintiffs responded that apportionment was inappropriate in the circumstances presented. They contended that, in crash-worthiness cases such as the present one, where plaintiffs were seeking damages only for second-collision or enhanced injuries, i.e., injuries, such as Annette's death, which were not caused by the accident itself but were caused exclusively by the vehicle's design defect, there is no basis for apportionment of fault between the vehicle manufacturer and the parties who caused the accident.
The judge denied Daimler's request for an apportionment charge. He concluded that, based upon the evidence adduced at *417 trial, there was an indivisible injury which was not capable of being apportioned. He clarified his view as follows:
This has been ... a case where the defendant has defended ... saying that their windshield header, their roof structure[,] was a safe design and that nothing could have prevented the injuries  the death  that ensued here.
The plaintiff has alleged that there was a design defect and that there was a reasonably or safe alternative design that would have prevented this injury. So I don't think that this case is capable [of apportionment] because of the nature of the injury, the nature of the proofs in this case, not because there's not evidence before this jury for them to determine whether or not Exxon Mobil was negligent or Cody Burke was negligent but because I think the injuries are not capable of apportionment here....
* * *
Plaintiff contends that Mrs. Boryszewski's death was caused directly by the defective roof header  windshield header. And it is plaintiff's contention that had Chrysler provided a safer design for that header, that ... the death would not have occurred and that she would have survived unharmed. Parenthetically[,] as previously indicated[,] plaintiff is not seeking an award for any enhanced injuries so to speak; that is, what the injuries would have been had the roof not deformed as much as it had.
Chrysler has vigorously defended the design defect allegation and contends that nothing would have prevented the Boryszewski death as it pertains to its windshield header; that the header was reasonably safe, suitable and fit for its intended purpose[;] and that the plaintiff has not proved that there was a defect in this case.
So [,...] because of the way [the case] has gone in, because this Court believes that the injuries are not divisible so to speak, the Court will not grant Daimler's application for an apportionment charge. I don't find that a jury could find that those injuries are divisible.
The jury charge given conformed with model jury charge terms except that it omitted any reference to apportioning liability. Subsequently, the trial judge, for the same reasons as previously expressed, denied Daimler's motion for a new trial based on the omission to charge on apportionment.

B
Jury instructions should correctly state the applicable law in clear and understandable language. See Mogull v. CB Commercial Real Estate Group, Inc., 162 N.J. 449, 464, 744 A.2d 1186 (2000); Cavanaugh v. Skil Corp., 331 N.J.Super. 134, 160, 751 A.2d 564 (App.Div.1999), aff'd, 164 N.J. 1, 751 A.2d 518 (2000). Appellate courts should review jury instructions as a whole, and may not reverse if the charge adequately conveys the law and is unlikely to confuse or mislead the jury. See Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 418, 690 A.2d 575 (1997); Berberian v. Lynn, 355 N.J.Super. 210, 219, 809 A.2d 865 (App.Div.2002), aff'd as modified, 179 N.J. 290, 845 A.2d 122 (2004); Domurat, supra, 353 N.J.Super. at 93, 801 A.2d 423; Jefferson v. Freeman, 296 N.J.Super. 54, 65, 685 A.2d 1357 (App.Div.1996). Even erroneous jury instructions will be upheld if they are "incapable of producing an unjust result or prejudicing substantial rights." Sons of Thunder, supra, 148 N.J. at 418, 690 A.2d 575 (citing Fisch v. Bellshot, 135 N.J. 374, 392, 640 A.2d 801 (1994)). Accord, Mogull, supra, 162 N.J. at 464, 744 A.2d 1186; Cavanaugh, supra, 331 N.J.Super. at 161, 751 A.2d 564.

*418 C

New Jersey law favors the apportionment of fault among responsible parties. See N.J.S.A. 2A:15-5.1 to -5.8; Scafidi v. Seiler, 119 N.J. 93, 109-14, 574 A.2d 398 (1990); Reichert v. Vegholm, 366 N.J.Super. 209, 213, 840 A.2d 942 (App.Div.2004). The Comparative Negligence Act mandates the apportionment of fault where "the question of liability is in dispute." N.J.S.A. 2A:15-5.2a. The Act provides:
a. In all negligence actions and strict liability actions in which the question of liability is in dispute, . . . the trier of fact shall make the following as findings of fact:
(1) The amount of damages which would be recoverable by the injured party regardless of any consideration of negligence or fault, that is, the full value of the injured party's damages.
(2) The extent, in the form of a percentage, of each party's negligence or fault. The percentage of negligence or fault of each party shall be based on 100% and the total of all percentages of negligence or fault of all the parties to a suit shall be 100%.
[N.J.S.A. 2A:15-5.2a.]
It is appropriate for juries to apportion fault between defendants who settled before trial and those who did not. Settling defendants may not be held liable to pay more than the settlement amount, however. See Young v. Latta, 123 N.J. 584, 591-96, 589 A.2d 1020 (1991).
The New Jersey Supreme Court has recognized that, although rare, cases may arise where it is extremely difficult or impossible to apportion damages. See Campione v. Soden, 150 N.J. 163, 175, 184-85, 695 A.2d 1364 (1997)(involving automobile "pile-up"/successive rear-end collisions). In such cases, the Court favors "rough apportionment." See id. at 184-85, 695 A.2d 1364. The Court has articulated the standards for trial courts to follow in cases in which apportionment of fault is either extremely difficult or impossible based upon the evidentiary record developed at trial:
At the conclusion of a trial where allocation of damages among multiple tortfeasors is an issue, the trial court is to determine, as a matter of law, whether the jury is capable of apportioning damages. The absence of conclusive evidence concerning allocation of damages will not preclude apportionment by the jury, but will necessarily result in a less precise allocation than that afforded by a clearer record. If the court establishes as a matter of law that a jury would be incapable of apportioning damages, the court is to apportion damages equally among the various causative events. If the court concludes that the jury would be capable of apportioning damages, the jury should be instructed to do so.
[Campione, supra, 150 N.J. at 184-85, 695 A.2d 1364 (citations omitted).]
See also Loui v. Oakley, 50 Haw. 260, 438 P.2d 393 (1968)(cited in Campione).
Normally, the burden of proof for apportionment is on the plaintiff because, "[i]n the normal prior or post-personal injury aggravation claim, the party in the best position to present evidence of non-aggravation or exacerbation is plaintiff." Reichert, supra, 366 N.J.Super. at 214, 840 A.2d 942 (quoting O'Brien (Newark) Cogeneration, Inc. v. Automatic Sprinkler Corp. of Am., 361 N.J.Super. 264, 274, 825 A.2d 524 (App.Div.2003), certif. denied, 178 N.J. 452, 841 A.2d 90 (2004)).
Nevertheless, the burden of proof on apportionment has sometimes been placed on the defendant. An example is found in medical malpractice cases presenting a pre-existing condition where there is an *419 innocent plaintiff and practical difficulties exist in separating the harm caused by the malpractice from the harm caused by the pre-existing condition. See Scafidi, supra, 119 N.J. at 113-14, 574 A.2d 398; Reichert, supra, 366 N.J.Super. at 214-16, 840 A.2d 942. The burden of proof has also been placed on defendants where the plaintiff is entirely innocent, and where the defendant is deemed "knowledgeable" and "in a superior position to distinguish those damages related to the claimed tortious conduct from those related to concurrent causes," or where the plaintiff suffered a "unitary harm"/"indivisible injury" caused by the concurrent wrongs of several defendants. See Reichert, supra, 366 N.J.Super. at 216-22, 840 A.2d 942 (noting that the burden of apportionment has been placed on defendants in asbestos exposure, toxic tort, legal malpractice, and transportation bailment cases).
In product liability crashworthiness cases such as the instant matter, a rationale based on "unitary harm"/"indivisible injury" perceptions has justified placing the burden of apportionment on defendants. See id. at 222-23, 840 A.2d 942. See also, Poliseno, supra, 328 N.J.Super. at 53-55, 744 A.2d 679; Green v. General Motors Corp., 310 N.J.Super. 507, 528-29, 709 A.2d 205 (App.Div.), certif. denied, 156 N.J. 381, 718 A.2d 1210 (1998); Crispin, supra, 248 N.J.Super. at 569 n. 1, 591 A.2d 966; William A. Dreier, New Jersey Products Liability and Toxic Torts Law § 8:3-8, pp. 221-24 (Gann 2005); Brian E. Mahoney, New Jersey Personal Injury Recovery, § 15:6-6, pp. 463-68 (Gann 2005).
Some guidance for resolving the issue before us is provided in a series of cases dealing with the issue of apportionment in the context of automobile accident cases in general and crashworthiness cases in particular, although none have facts that are squarely on point with the facts of this case.
In Waterson v. Gen. Motors Corp., 111 N.J. 238, 544 A.2d 357 (1988), the plaintiff's car went out of control and crashed into a utility pole as the result of a defective axle. At the time of the accident she was not wearing a seat belt. The issue on appeal was the extent to which the plaintiff's failure to wear a seat belt affected her right to recover damages for the personal injuries she suffered as a result of the accident. Id. at 241, 544 A.2d 357.
The Court held the jury could consider the plaintiff's comparative fault in not wearing a seat belt. If the jury were to find the plaintiff negligent, then the damage award should be reduced to fairly reflect her percentage of fault. See id. at 241-42, 262-76, 544 A.2d 357.
The Court distinguished between "first-collision" and "second-collision" injuries. "First-collision injuries represent those injuries that would have occurred irrespective of whether or not the injured party used a seat belt. Second-collision injuries are sometimes referred to as add-on or enhanced injuries, and are injuries that the use of a seat belt arguably could prevent." See id. at 252, 544 A.2d 357.
The Court held that the plaintiff's percentage of negligence in not wearing a seat belt should be used to discount only the second-collision injuries. The jury should first find the total amount of damages incurred as a result of the accident. Next, the jury should determine each party's comparative negligence in causing the accident, expressed in percentages. Next, the jury should determine whether the plaintiff was negligent for failure to wear a seat belt, independent of any possible negligence contributing to the accident. If the jury finds the plaintiff negligent for not wearing a seat belt, then the jury should determine whether that negligence *420 increased the nature and severity of her injuries. If the jury finds that the negligent failure to wear a seat belt increased the extent or severity of the plaintiff's injuries, the jury must isolate the second-collision damages and determine the value of those damages. To do so, the jury would calculate the amount of damages plaintiff would have incurred had she worn a seat belt, then subtract that amount from the total damages actually incurred. The difference represents the second-collision damages. See id. at 271-74, 544 A.2d 357.
The jury should then determine the percentage of the plaintiff's comparative fault for damages arising from the second-collision injuries:
The total negligence for these second-collision... damages consists of (a) defendant's negligence in causing the accident (since without that negligence there would have been no accident and no injuries of any kind), (b) plaintiff's comparative negligence, if any, in causing the accident (since, again, without plaintiff's comparative negligence there would have been no accident and no injuries), and (c) plaintiff's negligence in failing to use a seat belt (since without that negligence there would not have been any second-collision injuries).
[See id. at 273, 544 A.2d 357.]
The court is to mold the jury's damages and negligence findings, reducing the plaintiff's recovery in accordance with the jury's percentage allocations of liability. See id. at 273-75, 544 A.2d 357.
The Waterson paradigm governed our decision in Crispin v. Volkswagenwerk AG, 248 N.J.Super. 540, 591 A.2d 966 (App. Div.), certif. denied, 126 N.J. 385, 599 A.2d 162 (1991). In Crispin, the plaintiff had been injured in an automobile accident in which his vehicle, a Volkswagen Beetle, traversed a highway median, revolved in a semi-circle, and was struck from the rear by an oncoming vehicle. The plaintiff was not wearing a seat belt. See id. at 544, 591 A.2d 966.
The plaintiff filed two different lawsuits against various defendants. See id. at 544-46, 591 A.2d 966. In the case before us, the plaintiff had sued Volkswagen under a crashworthiness theory, alleging that the front seat of the Beetle was defectively designed, and that the design defect caused second-collision injuries, i.e., those injuries enhanced by the alleged defect and not caused by the crash alone. See ibid. Plaintiff's alleged second-collision injuries were "quadriplegia resulting from compression of the spine and severance of the spinal cord when his body continued rearward into his neck as his head violently struck the rear structure of the automobile[,]" allegedly as a result of the design defect in the vehicle's front seat. See id. at 547, 591 A.2d 966.
The jury found for plaintiff on the design defect theory, and also, alternatively, on a claim that Volkswagen had failed to provide users with adequate warning of the dangers attributable to non-use of the vehicle's seat belts. See id. at 544, 549, 591 A.2d 966. The jury determined that plaintiff's failure to wear a seat belt contributed to his injuries and that he was twenty-five percent at fault. However, because one of the bases of the liability verdict was defendant's failure to warn, the trial court did not mold the verdict to reflect plaintiff's comparative negligence. See id. at 549, 591 A.2d 966.
We held that the trial court had not erred in refusing to reduce the damage award to account for plaintiff's comparative negligence. See id. at 564-69, 591 A.2d 966. Because the only damages plaintiff sought were the second-collision damages, plaintiff's comparative negligence in causing the original accident had no bearing on the case. See id. at 567-69, *421 591 A.2d 966. Moreover, plaintiff's negligence in failing to wear the seat belt was precisely the risk about which defendant had a duty to warn. Therefore, there could be no comparative negligence on the part of plaintiff with respect to the failure to warn aspect of the case. See id. at 564-65, 591 A.2d 966.
In dictum, we went on to suggest that:
In a case involving first collision injuries and second collision injuries, the Waterson formula would be applied, for example, even where all defendants responsible for the initial collision have settled. Although the procedure proposed here would undoubtedly complicate and add to the issues in a trial of the non-settling defendant, this method would yield a fair and accurate assessment of the fault and damages attributable to the settling "first collision" defendants.
[Id. at 571, 591 A.2d 966.]
We revisited the apportionment issue in Green, supra, 310 N.J.Super. at 525-29, 709 A.2d 205. There, the plaintiff had been injured in a motor vehicle accident involving his vehicle and a school van. See id. at 511-13, 709 A.2d 205. At the time of the accident, the plaintiff was wearing his seat belt, but he was driving greatly in excess of the twenty-five-mile-per-hour speed limit. See id. at 512-13, 709 A.2d 205.
In his claim against General Motors, the plaintiff alleged a design defect with his Camaro's T-roof, and contended that design defect caused the roof to collapse on his head, causing his second-collision, i.e. enhanced, injuries, rendering him a quadriplegic. See id. at 513-14, 523-25, 709 A.2d 205. General Motors responded by claiming that the plaintiff suffered his injuries when he was thrown from the vehicle and landed on his head. See id. at 514, 709 A.2d 205.
The jury ruled in the plaintiff's favor. It found the roof collapse to have been a proximate cause of his injuries, and that one hundred percent of the injuries were attributable to the design defect in the roof. Presumably because of an earlier settlement with the driver and owner of the school van, the jury was given no interrogatories relating to the liability of the other driver. The record was unclear whether General Motors had ever made a cross-claim for contribution against those former co-defendants, and, if so, whether that cross-claim had been withdrawn when those defendants were released by the plaintiff. See id. at 515, 709 A.2d 205.
On appeal, General Motors contended that the plaintiff bore the burden of proof on apportionment, i.e., to establish the injuries he suffered in the accident (for which plaintiff and the van driver were responsible) and the distinguishable injuries he suffered as a result of the design defect (for which General Motors was responsible), and that the plaintiff had not met his burden of proof. See id. at 525-26, 709 A.2d 205. We disagreed, holding that, in crashworthiness cases, defendants bore the burden of proof on apportionment. We held, further, that the jury's finding that the injuries were one hundred percent attributable to the design defect in the vehicle's roof made apportionment unnecessary. See id. at 526-29, 709 A.2d 205.
In so ruling, we adopted a Restatement test providing:
"(b) If proof supports a determination of the harm that would have resulted from other causes in the absence of the product defect, the product seller's liability is limited to the increased harm attributable solely to the product defect.
(c) If proof does not support a determination under Subsection (b) of the harm that would have resulted in the absence *422 of the product defect, the product seller is liable for all of the plaintiff's harm attributable to the defect and other causes."
[Green, supra, 310 N.J.Super. at 528, 709 A.2d 205 (quoting Restatement (Third) of Torts: Products Liability, § 16(b), (c)(1998)).]
In Green, the plaintiff had also cross-appealed from the trial court's decision to deduct $799,000 from the damages award, representing the settlement of his claim against the van driver and her employer. See id. at 542, 709 A.2d 205. The plaintiff argued that, since the jury had determined that one hundred percent of his injuries were caused by the design defect, any liability assessment in respect of the settling defendants was foreclosed. See id. at 543, 709 A.2d 205.
We expressed the belief, given the plaintiff's claim that the van had been straddling the center line forcing him to swerve around it, that the jury could have been asked to allocate some percentage of negligence against the settling defendants. "Theoretically, the van driver might have been liable for a percentage of all damages occasioned by the accident, unless a court held that the design defect was an independent intervening cause, relieving the van driver of her liability." Thus, General Motors may have been able to hold the van driver for contribution for some percentage of the total fault for the plaintiff's injury. See id. at 544, 709 A.2d 205.
We held, however, that, as a procedural matter, General Motors had waived the right to contribution from the settling defendants because General Motors had never requested an allocation of liability against them. See id. at 544-47, 709 A.2d 205. General Motors, "by failing to have the jury assess the van driver's percentage of fault, gave up its potential claim to contribution." Id. at 547, 709 A.2d 205. Therefore, General Motors was not entitled to any credit for the settlement, even if it amounted to a windfall to the plaintiff. See ibid.
We again addressed apportionment issues in Poliseno, supra, 328 N.J.Super. at 52-63, 744 A.2d 679. There, the plaintiff and her husband, the driver, were involved in a single-car collision. As they passed another vehicle, their vehicle hydroplaned on a wet roadway, slid sideways off the road, jumped a curb on the right, and became wedged between a retaining wall and a tree. The driver died in the accident, and a wrongful death action resulted. The plaintiff claimed the driver's-side door of the vehicle had been defectively manufactured, and that the vehicle was not crashworthy. See id. at 46-47, 744 A.2d 679. She claimed the defects caused second-collision, i.e., enhanced, injuries to her husband that resulted in his death. She also sought damages for her own emotional distress resulting from her presence and observation of her husband's injuries and his death. See id. at 46, 744 A.2d 679.
The jury found the vehicle defective. It determined, however, that eighty percent of the injuries suffered were caused by the accident itself, and only twenty percent were caused by the defect in the vehicle's door. See id. at 46, 51, 744 A.2d 679.
We held that the defendant bore the burden of proof on apportionment, and it was error for the trial court to have instructed the jury otherwise. In crashworthiness cases, therefore, the plaintiff must prove only that a defect in the vehicle was a substantial factor in increasing or enhancing the injury beyond that which would have resulted had there not been a defect. See id. at 54-55, 744 A.2d 679.
When a plaintiff has sustained that burden, the plaintiff need not quantify to what extent the second collision enhanced *423 the injury. Rather, if the defendant seeks credit against the verdict for an injury that it claims resulted, in part, from the first collision, defendant shall have the burden of proof on that issue. [Id. at 55, 744 A.2d 679.]
We went on to hold that while death is indivisible as to result, it is capable of apportionment in terms of causation. See ibid. There could be concurrent causes of a single injury. See id. at 58, 744 A.2d 679. Accordingly, the driver's conduct in losing control of the vehicle was material in any determination of the cause of the death-producing injuries. The quality of the evidence entitled the defendant to a jury evaluation of its theory of the accident, that the driver's conduct caused his death-producing injuries. See id. at 57-58, 744 A.2d 679.
Under the plaintiff's theory of the case, General Motors was one hundred percent liable for her husband's death. Under General Motors's theory of the case, the plaintiff's husband was one hundred percent liable for his own death. See id. at 58-59, 744 A.2d 679. We held that there was sufficient evidence from which the jury could apportion fault in the manner in which it did (eighty/twenty), because the jury was free to accept or reject so much of the experts' testimony as it found logical and credible. The jury was entitled to find concurrent causation of the death-producing injuries. See id. at 59, 744 A.2d 679.
We concluded that the evidence is sufficient if it allows for rough apportionment. "The defendant was not required to produce evidence amounting to scientific or mathematical precision as to how much each collision contributed in percentage points to [the husband's] ultimate death." Id. at 60, 744 A.2d 679.
In the end, we reversed the judgment because the trial court had incorrectly assigned the burden of proof on apportionment to the plaintiff, and because the trial court had failed to explain the doctrine of concurrent causation. These errors had the capacity to affect the verdict, with the exception of the jury's finding of a manufacturing defect. Accordingly, we ordered a new trial on all questions except the manufacturing defect issue. See id. at 61-63, 744 A.2d 679.
Some governing principles emanate from the case law. Apportionment is favored under New Jersey law. When the question of liability is in dispute, a charge on apportionment is generally appropriate. Regardless of which party bears the burden of proof, the quantum of evidence required to qualify for an apportionment charge is low. The law favors apportionment even where the apportionment proofs are imprecise, allowing only for rough apportionment by the trier of fact. Indeed, an arbitrary apportionmentequally among the various causative elementsmay be appropriate where the trial court determines, as a matter of law, that the jury would be incapable of making an apportionment. See Campione, supra, 150 N.J. at 184-85, 695 A.2d 1364.
Applying these principles to the instant matter, we conclude that the first trial judge erred in declining to give an apportionment charge. Although, as we have already observed, the facts before us are not directly on point with those in any of the apportionment cases we have discussed, it is essentially undisputed that one or more of the settling defendants (Burke, Gazzani Motors, and Mobil Oil) were responsible for the accident itself, i.e., the first collision. No suggestion is raised that Annette was liable for either the first collision or the second. In other respects, however, liability for Annette's death was clearly in dispute. Plaintiffs contended that the design defect in the *424 Voyager's windshield header was the sole cause of her death. According to plaintiffs, Annette would not have died solely from the accident. Daimler, on the other hand, contended that the Voyager's roof system was reasonably safe and strong. Daimler maintained that the tire hit the Boryszewski's vehicle with such great force that, notwithstanding the roof system's adequate design, the roof collapsed, killing Annette.
As in Poliseno, the parties in this case took extreme positions. If the jury accepted either side's position in its entirety, then apportionment of fault for Annette's second-collision injuries would have been inappropriate. Yet, the jury in this case, as in Poliseno, was entitled to take a more moderate position than propounded by either of the parties. The jury was entitled to accept or reject so much of each side's evidence as it found credible or not credible.
Of course, the evidence to support a middle-ground apportionment position was sketchy, at best, suggesting that rough apportionment may have been the required course. The trial proofs regarding the second-collision damages were incomplete. Neither plaintiffs nor Daimler introduced any evidence establishing the force with which the tire struck the Boryszewski's vehicle. Thus, there was no way to determine definitively whether, but for the design defect in the Voyager's windshield header, Annette would have survived the accident. There was also no evidence establishing what injuries, if any, Annette would have suffered from the accident alone, absent any design defect in the vehicle's windshield header.
Another complication arises from the manner in which Daimler introduced the apportionment evidence. Neither Burke nor any employees of Gazzani Motors or Mobil were called to testify at trial. Instead, Daimler relied upon pretrial deposition testimony to establish the liability of these settling codefendants. Although nominally admissible under N.J.R.E. 804(b), and sufficient to allow the jury to assign fault for the accident itself, this was not the best manner in which to introduce critical evidence, particularly given the allegations relating to Mobil's alleged vicarious liability for the actions of the employees of Gazzani Motors. The concept of vicarious liability may be difficult for a jury to understand even with the best of evidence. On the other hand, we are constrained to conclude that Daimler's proofs, however weak, were adequate to create a question to be resolved by a well-instructed jury, including a carefully crafted charge on the burden of proof. In the circumstances, a fair and reasonable jury could have concluded that there were concurrent causes of Annette's death, and that one or more of the settling defendants bore at least some percentage of responsibility for Annette's death along with that borne by Daimler for the design defect in the Voyager's windshield header. See Poliseno, supra, 328 N.J.Super. at 57-59, 744 A.2d 679. Annette's death is indivisible as to result, but not necessarily as to causation. See id. at 55, 744 A.2d 679.
We note, as well, that one aspect of plaintiffs' damages had nothing to do with Annette's death and was clearly capable of apportionment among all participating defendants. Specifically, plaintiffs sought damages not only for Annette's death and the emotional distress suffered by the boys as a result of witnessing Annette's death, but also for the emotional distress the boys suffered as a result of having been in the accident. Liability for such damages did not rest solely with Daimler. There was no allegation that Daimler caused the accident, only that its design defect caused increased harm resulting from the accident. *425 The settling codefendants bore sole responsibility for causing the accident itself.
We observe, independently of our discussion on the damages issues arising from the emotional distress claims, that it may be difficult for a jury to separate the emotional distress the boys suffered from being in the accident from the emotional distress they suffered as a result of witnessing their mother's violent and gruesome death. Indeed, in neither of the two trials were the juries asked to reflect separately on these two aspects of the boys' emotional distress damage claims. The trial court, on remand, is obliged to craft instructions for the jury isolating the two aspects of emotional distress for the purposes of apportionment.
For the foregoing reasons, we reverse and remand for a new trial on the issue of apportionment of fault.

IV
Daimler also contends that plaintiffs' settlement with Mobil is void as against public policy because it assigned to Mobil a contingent interest in plaintiffs' tort claim against Daimler. That precise argument is not raised with respect to the other settling defendants: Burke for $300,000 and Gazzani Motors for $500,000.
In its settlement agreement, Mobil agreed to pay plaintiffs $2 million in a structured form in exchange for a general release. Plaintiffs agreed that if they recovered a judgment against Daimler for more than $1 million, they would repay Mobil one-third of the excess, up to a maximum of $500,000.
Daimler contends, as well, that the settlements should be set aside because they deprived Daimler of its cross-claims for contribution and indemnification against the settling codefendants.
On the opening day of the first trial, shortly before the proceedings began, plaintiffs settled with Mobil. Apparently, the settlements with Burke and Gazzani Motors had been reached earlier. Because of a "request for confidentiality," the record of the proceeding relating to Mobil's settlement was "placed under seal."
The day after the settlement was placed on the record, Daimler opposed the agreement's confidentiality provision on the ground that it was against public policy. Daimler argued that, since the boys were minors at the time of the accident, a public hearing must be held to establish that the settlement was fair and reasonable as to its amount and terms. R. 4:44-3. See Zukerman by Zukerman v. Piper Pools, Inc., 256 N.J.Super. 622, 627-29, 607 A.2d 1027 (App.Div.), (holding that the terms of a settlement agreement involving an injured infant must be made public), certif. denied, 130 N.J. 394, 614 A.2d 617 (1992). Daimler's counsel also objected to the settlement having been placed on the record outside their presence.
Responding to Daimler's objections, the judge stated that he would address the legality of the confidentiality provision at the time of the required hearing. He also advised Daimler that, if it wished to know the terms of the settlement before the hearing, it should file a motion. As far as we can tell from the record on appeal, Daimler never filed a motion to compel disclosure of the settlement's terms.
The hearing on the settlement was held some seventy-five days after the conclusion of the first trial. Following the judge's oral opinion approving the settlement, Daimler objected to it contending that it was void as against public policy to the extent plaintiffs had assigned Mobil an interest in their claims against Daimler. The court ordered briefs on the issues raised.
*426 About three weeks later, the judge delivered another oral opinion approving the settlement and rejecting Daimler's objections on the basis that Daimler lacked the standing to object to the settlement. A confirming order was entered several days thereafter.
We disagree with the trial judge's standing determination. "A substantial likelihood of some harm visited upon the plaintiff in the event of an unfavorable decision is needed for the purposes of standing." In re Adoption of Baby T., 160 N.J. 332, 340, 734 A.2d 304 (1999). Although, in general, non-settling defendants lack standing to object to a partial settlement, they may object to one that affects their rights. See Eichenholtz v. Brennan, 52 F.3d 478, 482 (3d Cir.1995); see also, e.g., Ocean County Chapter Inc. of the Izaak Walton League v. Department of Envtl. Protection & Energy, 303 N.J.Super. 1, 11, 696 A.2d 25 (App.Div. 1997); East/West Venture v. Borough of Fort Lee, 286 N.J.Super. 311, 669 A.2d 260 (App.Div.1996). Also, as a general matter, New Jersey's rules for standing are liberal and permissive. Hammock v. Hoffmann-LaRoche, Inc., 142 N.J. 356, 379-80, 662 A.2d 546 (1995).
At least nominally, Daimler's rights were potentially affected by the fact of a settlement with Mobil sufficiently to confer standing to object to the terms. Nevertheless, we conclude that, on analysis, Daimler's positions regarding the settlement lack merit. Daimler's rights were not so extensively affected by plaintiffs' settlement with Mobil to justify undoing the benefits the settlement conferred. We are also not impressed with Daimler's lack of diligence in pursuing this issue, i.e., its failure to make a timely motion for disclosure of the terms of the settlement.
The settlement did not involve an assignment of a tort claim prior to judgment. See, e.g., Village of Ridgewood v. Shell Oil Co., 289 N.J.Super. 181, 673 A.2d 300 (App.Div.1996). At all times, plaintiffs retained a direct interest in vigorously pursuing their claims against Daimler. Nor is there any indication in the record that Mobil in any way controlled either plaintiffs' litigation strategy or plaintiffs' right to settle or otherwise compromise their claims. Indeed, Mobil did not even participate in the trial. This matter is unlike the situation in Village of Ridgewood where, after the settlement, a party retained the same counsel as had represented its former adversaries. Cf. Eichenholtz, supra, 52 F.3d at 487-88 (observing that a pretrial partial settlement was not prejudicial to a non-settling defendant simply on the basis that the settling defendant obtained the right to consent to any future settlement between the plaintiff class and non-settling defendants, because the settling defendant could not unreasonably withhold consent and because the court had ultimate authority to approve or disapprove the settlement of a class action claim).
The terms of the settlement agreement providing, potentially, for partial repayment by plaintiffs to Mobil nominally reflected a recognition by plaintiffs that Mobil may have overpaid its share of plaintiffs' damages. Any liability on the part of Mobil would have been vicarious liability for the actions of the employees of Gazzani Motors, and, notwithstanding the settlement, Mobil contested its liability. The settlement between plaintiffs and Mobil was neither an actual assignment of interest in plaintiffs' claim against Daimler nor the functional equivalent.
There is also no merit in Daimler's contention that Mobil's pre-trial settlement of plaintiffs' claims deprived Daimler of its right to seek contribution. The reasoning in Eichenholtz, id. at 479-80, is dispositive. *427 In federal class action securities litigation, such as there, it is necessary to obtain court approval for any settlement. Id. at 482. The district court had approved, pretrial, a partial settlement between the plaintiffs and some of the defendants. The Third Circuit Court of Appeals affirmed, determining that the settlement agreement was neither unfair nor prejudicial to the non-settling defendants. It did not deprive the non-settling defendants of their right to contribution from the settling defendants because the non-settling defendants would be entitled to a setoff in respect of any judgment ultimately entered against them. See id. at 486-87.
Similarly, in the instant case, Mobil's settlement with plaintiffs did not deprive Daimler of its right to contribution, as Daimler contends. It was the first trial judge's refusal to give a charge on apportionment that deprived Daimler of its potential contribution right. If apportionment of fault had been allowed, Daimler would have received a setoff for the proportion of fault the jury allocated to the codefendants who settled before trial, if any. See Young, supra, 123 N.J. at 591-96, 589 A.2d 1020; Green, supra, 310 N.J.Super. at 542-47, 709 A.2d 205; Rogers v. Spady, 147 N.J.Super. 274, 277-78, 371 A.2d 285 (App.Div.1977). Our reversal and remandment of that issue restores to Daimler, in full measure, its right to seek contribution or its equivalent.
Accordingly, for the foregoing reasons, we reject the contention that the settlement between plaintiffs and Mobil is void as against public policy, or that the settlements together should be declared void because they deprived Daimler of its right to contribution.

V
We turn, now, to the multi-faceted issues of damages raised in plaintiffs' appeal. Plaintiffs contend, generally, that the trial court erred in overturning the first jury's damage awards and ordering a new trial on damages, and in failing to employ remittitur as a corrective device. They argue that the first jury's verdict should be restored. Plaintiffs also assert that the second trial judge erred in the questions he submitted to the jury on emotional distress damages, and in the charge to the jury on that issue. They also contend that the second jury's damages awards should be set aside as being, in several particulars, erroneous, inadequate and contrary to the weight of the evidence. They argue that, if the first jury's verdict is not reinstated or a remittitur ordered, we should reverse the damages aspect of the judgment and remand for a new trial on damages.

A
Jury verdicts should be set aside in favor of new trials only with great reluctance, and only in cases of clear injustice. See Crego v. Carp, 295 N.J.Super. 565, 577, 685 A.2d 950 (App.Div.1996). On a motion for a new trial, all evidence supporting the verdict must be accepted as true, and all reasonable inferences must be drawn in favor of upholding the verdict. See Harper-Lawrence, Inc. v. United Merchants and Mfrs., Inc., 261 N.J.Super. 554, 559, 619 A.2d 623 (App.Div.1993).
Neither trial nor appellate courts may grant a new trial unless it clearly appears there was a miscarriage of justice. See R. 2:10-1; R. 4:49-1(a); Dolson v. Anastasia, supra, 55 N.J. at 6-9, 258 A.2d 706. Appellate courts should give considerable deference to a trial court's decision to order a new trial because "the trial court has gained a `feel for the case' through the long days of the *428 trial." Lanzet v. Greenberg, 126 N.J. 168, 175, 594 A.2d 1309 (1991).
With respect to damages verdicts in particular, courts should not set aside damage awards as excessive unless the amount awarded shocks the judicial conscience. All damages evidence should be viewed in the light most favorable to the prevailing party, with deference given to the trial court's feel for the case. See Caldwell v. Haynes, 136 N.J. 422, 432, 643 A.2d 564 (1994); Carey v. Lovett, 132 N.J. 44, 66-67, 622 A.2d 1279 (1993); Baxter v. Fairmont Food Co., 74 N.J. 588, 597-600, 379 A.2d 225 (1977).
We must examine the first trial judge's discretionary determination to set aside the jury's damages awards and order a new trial on damages alone in the context of the foregoing canons.
In finding the $5 million wrongful death award both excessive and inconsistent with the evidence adduced at trial, the judge stated:
Now the jury awarded $5 million on the wrongful death claim. Now ... this court is mindful that it is not to inject itself as in this case to be the eleventh juror, there were ten. But when one looks at the wrongful death damages in this case, when it reviews the testimony of Dr. Gaughan [plaintiffs' economics expert], of Ms. Kolsky [plaintiffs' vocational employability assessment expert], and when it looks at the amount of time Ms. Boryszewski would have had to offer advice, counsel and such, .... [e]ven if this court were to allow ... 25 percent more, that would only make it $600,000.
So I am disturbed by what seems to be from this court a total, total abdication in the issue of damages. This jury had when it looked at, or should have looked at, the pecuniary interests lost as a result of Mrs. Boryszewski's death. [sic]
With respect to the boys' emotional distress awards, the judge never explicitly ruled that the three $5 million awards were excessive. Rather, the concerns he expressed bore only upon the fact that the awards were equal for each child. He believed this was inconsistent with the evidence adduced at trial, which showed that each boy suffered different levels of emotional distress and had a different prognosis for his recovery. The judge stated:
Each of the children was awarded $5 million on their emotional distress claims. This court has taken the time to go over Dr. Greenberg's [plaintiffs' treating psychologist and expert witness] testimony in detail just now, and it's clear that although each of them is one of Mrs. Boryszewski's children, obviously, that each of them reacted to the accident differently, each of them has varying degrees of depression.
Brian is the highest risk in dealing with relationships in the future. It would seem, and the court infers, that Timothy would be next and Matthew to a lesser degree.
This jury failed in this court's opinion to differentiate among those three boys and simply awarded  not simply, but awarded $5 million to each of the children without, in this court's opinion, going through the testimony and delineating and identifying each child and what each child suffered and in this court's opinion abdicated its responsibility in treating each child's claims individually.
... I am troubled by awarding each of the children the same amount of money, although each of them had very different reactions and today ... react differently and will in the future according to Greenberg be at varying risks.
In making the choice between the fidelity that must be afforded a jury's verdict, *429 and the deference owed to the trial judge's discretionary evaluation based upon his "feel for the case," see, e.g., Lanzet, supra, 126 N.J. at 175, 594 A.2d 1309; Baxter, supra, 74 N.J. at 600, 379 A.2d 225, we are obliged to examine the record closely. Our examination in this case reveals that the record supports the first trial judge's determination to set aside the wrongful death damages verdict as unsupported by the evidence, but that a fair evaluation of the proofs does not support the ruling setting aside the emotional distress damage verdicts.

B
We are in substantial agreement with the first trial judge's evaluation of the troubling disparity, by degrees of magnitude, between the proofs on the wrongful death damages claim and the $5 million verdict reached. He was correct to vacate that award and order a new trial on wrongful death damages. A damage award of $5 million was unsupported by direct evidence in the record. The law does not permit damage awards based upon speculation, passion, prejudice, or any other arbitrary consideration. Botta v. Brunner, 26 N.J. 82, 92-95, 138 A.2d 713 (1958). The first judge did not misapply his discretion in concluding that his jury's damages verdict for wrongful death violated this norm. Cf. Caldwell, supra, 136 N.J. at 442, 643 A.2d 564.
There is no adequate basis in the record before us for viewing the great differential between the experts' evaluations and the jury verdict as justified by the considerable discretion reposed in jury evaluations. See, e.g., Hudgins v. Serrano, 186 N.J.Super. 465, 481, 453 A.2d 218 (App.Div.1982) (holding that a wrongful death damages verdict that exceeded a reasonable award by two hundred percent was so disproportionate as to constitute a manifest injustice, and suggesting that deviation by twenty percent might easily be understood and justified).
Plaintiffs' economic expert in the first trial opined that, as a result of Annette's death, the family suffered $125,054 in lost earnings. Although, at trial, that expert would not give an estimate of non-wage-related losses, and the issue was left for the jury, the expert conceded that, in a draft report, he had opined that the family's total economic loss was $479,000.
We are loath to second-guess a jury's evaluation of the economic value of the life a thirty-eight-year-old mother of three young sons, not only in the sense of the earnings she might have produced if her future expectations were fulfilled, but also for the economic value of the nurture, companionship, personal services, counsel, and the like, that she would have provided to the four persons dependent upon her for those functions and beneficences, her husband and the three boys. See N.J.S.A. 2A:31-5; Smith v. Whitaker, 160 N.J. 221, 231-32, 734 A.2d 243 (1999). Nevertheless, the award by the first jury represents so great a departure from the proofs actually adduced at trial as to justify the reconsideration ordered by the trial judge.

C
Plaintiffs contend that the first judge should not have ordered a new trial on damages without first offering remittitur as an option. Plaintiffs ask that, if we do not reinstate the first jury's damage awards, then we should remand for remittitur of those awards to the maximum amount of damages the evidence would have supported.
Remittitur describes the power of a court, upon a motion for a new trial due to excessive damages awarded by a jury, to require the plaintiff to consent to a specified *430 reduction in the jury's award as a condition for denial of the new-trial motion. See Fertile v. Saint Michael's Med. Ctr., 169 N.J. 481, 491, 779 A.2d 1078 (2001); Caldwell, supra, 136 N.J. at 443, 643 A.2d 564. "In other words, remittitur denies a defendant a new trial if a plaintiff consents to a specified reduction in the jury award." Fertile, supra, 169 N.J. at 491, 779 A.2d 1078.
The goal is not for the trial court to substitute its judgment for that of the jury. Rather, it is to correct the jury's clear error or mistake, and to bring excessive damage awards "to the level that the court knows is within the limits of a proper verdict and thereby avoid the necessity of a new trial." Ibid.
The remitted amount should be "what a reasonable jury, properly instructed, would have awarded." Fertile, supra, 169 N.J. at 500, 779 A.2d 1078. Courts should remit excessive damage awards to the highest figure supported by the evidence. See ibid. Moreover, remittitur is encouraged at both trial and appellate levels. See Caldwell, supra, 136 N.J. at 443, 643 A.2d 564; Hudgins, supra, 186 N.J.Super. at 482, 453 A.2d 218.
The first judge should have considered remittitur as an option to ordering a new trial, and should have explained his reasons for rejecting that option. See Fertile, supra, 169 N.J. at 492, 779 A.2d 1078 (New Jersey courts "should, if possible, resort to an order of remittitur."). However, the law also provides that plaintiffs do not have an "absolute right to be offered a remittitur as an alternative to a new trial. Rather, the availability of the remittitur option is committed to the sound discretion of the trial court." Bartolo v. Boardwalk Regency Hotel Casino, Inc., 185 N.J.Super. 540, 543, 449 A.2d 1343 (Law Div.1982).
There are legitimate reasons why the first judge could have rejected remittitur of the wrongful death damages verdict as an option in this case. Specifically, remittitur is appropriate where a damage award is excessive and shocks the judicial conscience. See Fertile, supra, 169 N.J. at 498, 779 A.2d 1078; Baxter, supra, 74 N.J. at 596, 379 A.2d 225; McRae v. St. Michael's Med. Ctr., 349 N.J.Super. 583, 597, 794 A.2d 219 (App.Div.2002). Here, the judge's primary concern was that the wrongful death damages verdict was fundamentally tainted by impermissible considerations. The record supports that view and, here, therefore, in the circumstances, "the exceptional albeit useful" remedy of remittitur, Pressler, Current N.J. Court Rules, comment 1 on R. 4:49-1, p. 1586 (2006), could legitimately have been rejected as an option.
It is worth noting that plaintiffs' interest in remittitur is a relatively recent development, never requested by plaintiffs from the first trial judge for consideration as an alternative to ordering a second trial on damages. It was only after plaintiffs were disappointed with the damage awards from the second trial that they pursued remittitur of the first jury's damage awards. We are also unimpressed with Daimler's contention, at this juncture, after a second trial has already occurred, that remittitur of the first jury's damage awards is necessarily inappropriate. The purpose of remittitur is to avoid the expense and delay of a new trial. See ibid.

D
The second jury's award of $800,000 in wrongful death damages was much closer to the evidentiary mark, commanding our deference in applying the principle of respectful regard for a jury's discretion after an independent review of the record.
*431 Plaintiffs' economic expert at the second trial opined that plaintiffs' economic loss as a result of Annette's death was $1,528,941. Through vigorous cross-examination, however, defense counsel undermined the credibility of that damages assessment, suggesting that the expert's estimates as to how many hours Annette performed certain services were inflated, as were the rates at which the expert opined that Annette's services should be compensated. In determining that $800,000 was a "fair and just" wrongful death damage award under N.J.S.A. 2A:31-5, therefore, the jury could have legitimately discounted the figure propounded by plaintiffs' expert. The jury was entitled to accept only so much of the expert testimony as it found credible. See Waterson, supra, 111 N.J. at 248, 544 A.2d 357; Domurat, supra, 353 N.J.Super. at 90-91, 801 A.2d 423; Poliseno, supra, 328 N.J.Super. at 59, 744 A.2d 679; Amaru v. Stratton, 209 N.J.Super. 1, 20, 506 A.2d 1225 (App.Div.1985); Scelfo, supra, 58 N.J.Super. at 477-78, 156 A.2d 714; see also Ardis, supra, 86 N.J.Super. at 330-31, 206 A.2d 890.

E
Our review of the record in the light of the arguments advanced by the parties and prevailing principles of law discloses a compelling picture of the severe suffering required by law to support the boys' emotional distress claims. The proofs provided a reasonable basis for validating the first jury's verdicts in those regards.
All three boys had vivid recollections of the accidenttheir terror in seeing and hearing the tire hit the minivan and shatter the windshield, experiencing the minivan careening out of control before it stopped at the highway divider, hearing their mother scream, and seeing their mother collapsed and covered in blood and glass.
Matthew, at age fourteen the oldest of the three boys, did his best to safeguard his family. He was engaged and pro-active. He shut the minivan's ignition off even as the vehicle was moving, he removed his brothers from the vehicle, he stopped passing motorists to borrow cell phones to call for help, and he asked for assistance in removing seats from the minivan in order to make it easier for the ambulance crew to remove his mother. He also attempted to minister to his mother, but he could not find a pulse, she was bleeding profusely, and she was not breathing.
Annette's injuries, which all three boys observed, were gruesome, and the interior of the minivan was blood-soaked. At the second trial, State Trooper Robert Babitz described his observations of Annette's condition at the accident scene. He stated that Annette was non-responsive to voice stimulus, and had no pulse. He observed "severe trauma" to Annette's head, as well as blood and "brain matter" all over the seat and in the area of the dashboard. (Tr. 9/5/02 p. 53)
At the hospital after the accident, the boys' father, Witold, informed them of their mother's death. The children screamed and cried, and Witold did his best to comfort them.
Witold sought psychological treatment for all three sons to help them deal with the trauma of the accident and the pain of losing their mother. At first, Brian and Timothy attended sessions at a church-run hospice program in Jersey City, while Matthew participated in a counseling program offered through his school. Thereafter, the boys pursued counseling with separate psychologists in Livingston, ultimately all choosing to seek treatment exclusively with Dr. Jeffrey Greenberg. At *432 the time of both the first and second trials, all three boys continued to see Greenberg.
Each of the three boys suffered emotionally as a result of the accident. For example, each boy expressed fears relating to driving. Timothy, in particular, afterwards, always wanted to sit in the back seat of the family vehicle, and he became hyper-vigilant about his father and brothers wearing their seatbelts. Matthew also was particularly affected by fears of driving because he was close to driving age at the time of the accident. He feared driving near trucks, he tried to avoid main roads, and, while on the highway, he tried always to drive in the left lane, away from traffic.
The boys also suffered from nightmares, and, in the immediate aftermath of the accident, sought comfort by sleeping with their father. Timothy, who was just seven years old at the time of the accident, was visibly despondent and frightened. He would wake up screaming and crying at night, describing nightmares of the accident and of his mother behind the wheel covered in blood. He also cried often and sought unusual physical closeness to his father, asking Witold not to leave him at home, and questioning where Witold was going and when he would be back.
Matthew was the first to stop sleeping with his father. Soon thereafter, Brian returned to his own bed as well. Timothy, however, continued to sleep with his father for several years after the accident. Moreover, at the time of both trials, the boys continued to suffer from nightmares and flashbacks, albeit with diminishing frequency.
Overall, the record would support a conclusion that the two older boys, Matthew and Brian, were not less distressed, but were rather more stoic in their grief than the youngest brother, Timothy. Matthew and Brian were reluctant to show their emotions, and they attempted to deal with their losses without assistance from others. Consistent with their stoicism, Matthew and Brian had fewer sessions with Greenberg than did Timothy, and they were less open with Greenberg than Timothy was.
From all appearances, Matthew attempted to deal with his sorrow by remaining busy. Before the accident, he had been involved with extracurricular activities. He became even more involved after the accident. He joined every program that time allowedscouts, volunteering at church, drama and music programs at school, and student government. Matthew also maintained his good academic performance.
After the accident, Brian became withdrawn, quiet, and more serious then he had been before. Initially, he had stopped participating in some of his favored extracurricular activities; however, he quickly rebounded and began participating in extracurricular activities again, particularly after the family moved. Moreover, like Matthew, Brian maintained his good academic performance.
Dr. Greenberg opined that, at the date of both trials, each of the three boys continued to suffer from a low-grade depression and post-traumatic stress disorder (PTSD) resulting from the experience of the accident and from witnessing his mother's death. Greenberg stated that his diagnosis of delayed-onset PTSD did not occur until August 2001 because the boys only began reporting flashbacks around that time, as they experienced the stresses of moving and the upcoming trial.
Greenberg also opined that the diagnoses of depression and PTSD placed each boy at greater risk of engaging in self-destructive behavior as he grew older, as a means by which to dull his pain. Greenberg *433 stated that the possibility of self-destructive behavior was a particular concern for Matthew, given his avoidance of his emotions. In this regard, at the second trial, Greenberg opined that Matthew appeared, already, to be exhibiting signs of relationship/attachment difficulties. In particular, Greenberg found it unusual that, at the age of eighteen, Matthew was not developing romantic relationships with girls, or even close relationships with male friends.
Of the three boys, however, Greenberg was most concerned for Brian's mental and emotional well-being. Greenberg stated that Brian was a quiet and withdrawn child who held all of his feelings inside. He also stated there was a sadness and a sense of lethargy that was evident from Brian's appearance; however, Brian was very reluctant to reveal his emotions.
Timothy, on the other hand, was the most emotional of the three boys, and he was the most expressive regarding his suffering. At the first trial, Greenberg described how, during his initial sessions, Timothy would cry to the point that his whole body would shake; he would describe his nightmares, and talk about how sad he was and how much he missed his mother. At both trials, however, Greenberg noted that Timothy's depression symptoms had abated over time.
Like his brother Brian, in the immediate aftermath of the accident Timothy stopped participating in extracurricular activities he had previously enjoyed. Eventually, however, Timothy resumed such activities, particularly after the family moved. Moreover, like both of his brothers, Timothy maintained his good academic performance notwithstanding the accident.
In terms of more permanent changes, prior to the accident, Timothy was an outgoing, outspoken child. After the accident, he became more withdrawn and lonely. Witold also found it unusual that, since the accident, Timothy tended to make friends with single-parent children. Timothy told Witold that he related better to these children, and he found it easier to talk to them.
Viewing the proofs in the light most supportive of the first jury's verdict, the evidence reflected that Matthew and Brian were simply more stoic in their suffering than was Timothy. The evidence clearly showed that for some period of time after the accident, all three boys suffered intense grief; they were devastated by the loss of their mother and haunted by scenes of the accident and their mother's injuries. This rings true. By all accounts, each boy had a very close relationship with his mother. Moreover, the accident scene was bloody, gory, and so horrible as to be unquestionably traumatic for all those present. The boys witnessed their mother's skull crushed, with large amounts of blood and brain matter splattered around the interior of the vehicle in which they were traveling.
Even though each boy suffered differently, all suffered profoundly, sufficient to satisfy the legal standard for "severe emotional distress." See Buckley v. Trenton Sav. Fund. Soc'y, 111 N.J. 355, 366-67, 544 A.2d 857 (1988) (establishing the "severe emotional distress" standard for claims of intentional infliction of emotional distress); Portee v. Jaffee, 84 N.J. 88, 101, 417 A.2d 521 (1980) (establishing "severe emotional distress" standard for indirect injury/bystander claims)(applied in Dunphy v. Gregor, 136 N.J. 99, 642 A.2d 372 (1994)); Lascurain v. City of Newark, 349 N.J.Super. 251, 282, 793 A.2d 731 (App. Div.2002) (direct injury claims require same level of severe emotional distress regardless of whether infliction of emotional distress was negligent or intentional).
*434 The legal definition of "severe emotional distress" has been expressed in many different ways. For example, in the context of Portee claims of indirect injury advanced by bystanders, the Supreme Court has stated that "severe emotional distress" is distress that is "so severe that it resulted in physical manifestations or ... destroyed [the plaintiff's] basic emotional security," Carey, supra, 132 N.J. at 62, 622 A.2d 1279, or, alternatively, emotional distress that affects the plaintiff's "mental and emotional stability," Portee, supra, 84 N.J. at 100-01, 417 A.2d 521. See generally Howard H. Kestin, The Bystander's Cause of Action for Emotional Injury: Reflections on the Relational Eligibility Standard, 26 Seton Hall L.Rev. 512 (1996).
In the context of direct claims for intentional infliction of emotional distress, the Court has stated that the distress must be "`so severe that no reasonable man could be expected to endure it.'" Buckley, supra, 111 N.J. at 366-67, 544 A.2d 857 (quoting Restatement (Second) of Torts, § 46 comment j (1965)). Alternatively, the Court has stated that "[s]evere emotional distress means any type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so, including ... post-traumatic stress disorder." Taylor v. Metzger, 152 N.J. 490, 515, 706 A.2d 685 (1998) (quoting Poole v. Copland, Inc., 125 N.C.App. 235, 481 S.E.2d 88, 93 (N.C.Ct.App.1997), rev'd in part, 348 N.C. 260, 498 S.E.2d 602 (1998)).
Recently, describing the standard for negligent or intentional infliction of emotional distress, we stated in dictum that the distress must be "severe and substantial... not merely transitory but rather [having] a discernible effect on the plaintiff's ability to function normally, either physically or psychologically, on a daily basis." Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 360 N.J.Super. 265, 271, 822 A.2d 647 (App.Div.), aff'd in part, rev'd in part, 181 N.J. 70, 853 A.2d 921 (2004). It is not necessary that the plaintiff suffer physical manifestations of the emotional distress, although "accompanying physical manifestations are relevant both in proving that the emotional distress was severe and substantial and in assessing the quantum of damages." Id. at 271, n. 1, 822 A.2d 647.
Matthew, Brian, and Timothy sought two types of emotional distress damages. First, they sought damages for the "direct" emotional distress they suffered as a result of being in the accident. Second, they sought damages for the "indirect" or "bystander" emotional distress they suffered as a result of witnessing their mother's death. See, e.g., Carey, supra, 132 N.J. at 55-62, 622 A.2d 1279 (discussing distinction between direct and indirect emotional distress); Lascurain v. City of Newark, 349 N.J.Super. 251, 277-78, 793 A.2d 731 (App.Div.2002) (same). As to both types of emotional distress damagesdirect and indirectthe legal standard is the same. To recover, the boys were required to establish that they suffered "severe emotional distress." The record in this matter fully supports the conclusion that they did.
Notwithstanding that the quality and extent of each boy's suffering was unique and individualized, each was traumatized in two separate ways, suffering two distinct severe emotional distress injuries. The jury was clearly instructed about the separate components of the emotional distress damages it might find, but the interrogatories it was called upon to answer did not ask for separate verdicts as to each child regarding the monetary value of each of the two types of severe emotional distress he had suffered, i.e., on the one hand, from the trauma of being a direct victim of *435 defendants' breaches of duty as a participant in the accident; and, on the other hand, from the independent trauma of witnessing his mother's gruesome death. We cannot divine from the record how the jury may have assessed these separate injuries in responding affirmatively to the interrogatory regarding each boy's emotional distress damages, which asked whether he had "suffer[ed] severe emotional distress as a result of being in this accident and witnessing his mother's death." (Emphasis supplied).
The jury was required to make a complex evaluation and assessment as to each of the boys. Each child's journey from the unquestionably horrible double trauma of the common event to emotional health was unique and ongoing. Because we cannot know from the record how the jury may have assessed the particularized values of each child's exposure to the two events calling for compensation, or the individualized effects of the two traumas upon them, or the special ways each dealt with the event and the process of recovery, we cannot reach a principled conclusion that the equivalence of the jury's total award of damages to each child was anything more than a coincidence. It may well be that the separate evaluations and assessments to which the parties were entitled in respect of each child, individually, resulted in the same bottom-line figure for each notwithstanding that the weight of the discrete pertinent factors comprising each verdict might have been very different. On the face of the record, we can discern nothing excessive in a five million dollar verdict for any of the boys as recompense for the horrors of the day, the recovery process from the emotional injuries he experienced, and such lasting effects as the jury may have found were visited upon him. We cannot assume, therefore, that a five million dollar verdict for each of the boys was untoward, and can only conclude the first trial judge exceeded his discretion in so ruling. We have determined, accordingly, that the first trial judge erred in setting aside the damage awards for severe emotional distress, and that those verdicts must be reinstated and judgment entered upon them.

VI
Having reached the foregoing conclusion that the first jury's verdicts on damages for severe emotional distress must be restored, the remaining arguments advanced by plaintiffs regarding errors on the part of the second trial judge in retrying those damage issues are rendered moot.

VII
Summarizing the conclusions we have reached, we affirm the judgment on liability; we reverse the first trial judge's ruling vacating the damage award to the three infant plaintiffs and reinstate those verdicts, with judgment entered accordingly. We affirm the ruling vacating the first wrongful death damage award, and affirm the judgment reflecting the second jury's award; we affirm the trial court's rejection of the argument that plaintiffs' settlement with certain defendants was void as against public policy; and we reverse the first trial judge's denial of defendant Daimler's application to instruct the jury on apportionment of fault among defendants, and remand for a retrial on that issue. The damage judgments are, of course, conditioned upon the result of our remand for consideration of apportionment. The trial court shall mold appropriately the now-affirmed damage awards to reflect the apportionment percentages, if any, found by the next jury.
*436 Affirmed in part; reversed in part; remanded.