**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0232-17T2

JUAN PAGAN,

 Plaintiff-Respondent,

v.

FELIPE'S PLACE, INC., d/b/a
CRYSTALLINE LIQUORS,

 Defendants-Appellants,

and

CRISTOBAL ACOSTA and
KARINA ACOSTA,

 Defendants.

_____

   Submitted December 12, 2018 – Decided October 18, 2019

   Before Judges Nugent and Mawla.

   On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-0682-15.

   Paul E. Fernandez, attorney for appellant.

Bedi Rindosh, attorneys for respondent (Jason Alexander Rindosh, on the brief).

The opinion of the court was delivered by

NUGENT, J.A.D.

Plaintiff Juan Pagan, fell in a Paterson bar and liquor store owned by defendant Felipe's Place, Inc. d/b/a Crystalline Liquors (Crystalline), and severely fractured his right leg. During the trial of Pagan's personal injury action against Crystalline, the parties presented conflicting evidence about what Pagan was doing in the bar, whether he was sober when he entered, where in the bar he fell, what caused him to fall, and whether he sustained permanent injuries. The jury determined Crystalline's negligence was the sole cause of Pagan's accident and awarded him $175,000 in compensatory damages.

Crystalline appeals. First, it challenges the trial court's interlocutory order assessing defendants' and their attorney's fees after they successfully moved to vacate a default judgment. Next, Crystalline argues the trial court wrongly denied both the "motion for a directed verdict" it made during the trial and the "motion for ruling of a mistrial, judgment notwithstanding the verdict, or in the alternative remittitur" it made after the trial. Last, Crystalline argues the trial was unfair due to the cumulative effect of many errors, including the trial court taking judicial notice that Pagan had sustained a permanent injury.

2

Because Pagan's evidence and the legitimate inferences a juror could deduce from it would sustain a verdict if accepted as true, we conclude the trial court did not err by denying Crystalline's motion for a directed verdict. Our review of the record discloses no basis for concluding the trial court abused its discretion by denying Crystalline's post-verdict motions. Nor do we find the trial court abused its discretion in making the rulings Crystalline includes in its "cumulative error" argument. On the other hand, we cannot glean from the appellate record the court's reason for assessing fees—in connection with defendants' motion to vacate the default—against defense counsel, particularly after Pagan's attorney agreed not to enforce the award against defense counsel. We thus affirm the judgment but vacate the part of the pretrial order that awarded fees against defense counsel.

## I.

### A.

Pagan commenced this case by filing a complaint in February 2015. Defaults were entered against defendants Crystalline and Karina Acosta (Acosta) in July and September 2015, respectively. No default was entered against defendant Cristobal Acosta, who was never served with process, as he apparently passed away before the complaint was filed. The trial court entered

3

default judgment against Crystalline and Acosta in January 2016 and scheduled a proof hearing for May 2016. In April, Crystalline and Acosta successfully moved to vacate the default judgment over Pagan's opposition.

The order vacating the default judgment was filed on June 10, 2016. Five days later, Pagan's attorney filed a motion for an order awarding attorney's fees and costs pursuant to Rule 4:50-1. He argued in a memorandum that fees and costs should be awarded as "an equitable remedy to ameliorate prejudice suffered by a plaintiff in obtaining the default and defending the motion to set aside." The attorney filed a certification attesting to the work he performed in drafting the motion to enter default judgment, preparing for the proof hearing, appearing for the proof hearing, and argument on the defense motion to vacate the default judgment. His itemized billing totaled $2037.50. The motion included a proof of service on defense counsel.

The trial court granted the motion and awarded attorney's fees and costs against Crystalline, Acosta, and their attorney in the amount of $2000. The order includes no notation of the motion being opposed or unopposed and no explanation of the equitable basis for assessing the fees against Acosta and defense counsel.

A-0232-17T2

Defendants moved for reconsideration and challenged the basis for the fee award. Defense counsel certified he never received the motion for fees and costs. He also pointed out that fees had been assessed against him personally, and he had conferred with Pagan's counsel, who had agreed not to proceed against him. The court denied the motion for reconsideration and noted on the order that the original motion included notice to defense counsel. The court also noted the motion for reconsideration failed to show the original decision was based on palpably incorrect reasoning or that the court failed to consider relevant evidence.

The case proceeded to trial. The court denied Crystalline's motion for an involuntary dismissal at the close of Pagan's proofs but dismissed the claims against the Acosta defendants, Crystalline's principals, as Pagan had presented no evidence to support a claim against them. The jury returned a verdict for Pagan, and the court entered judgment on the verdict. Crystalline filed a motion for a ruling of a mistrial, judgment notwithstanding the verdict, or alternatively for remittitur. The trial court denied the motion. This appeal followed.

B.

The parties presented the following evidence at trial. Crystalline's bar has two rooms and a bathroom. Entering from the street, one walks into the first

room, which includes the liquor store, a cashier, and a bar.  Continuing toward the rear of the store, there is a step down to the billiards room, where there is another bar.  One must walk through the billiards room to get to the bathroom.

Pagan was thirty-four years old on the day he fell.  He had been going to Crystalline's bar since he turned twenty-one.  On the day he fell, he went to Crystalline's bar in the afternoon, though he did not recall the exact time.  He sat at the bar in the liquor store area, drank Coors Light, and talked with a few friends, though he did not know their names.  There were more than ten people in the bar.  Pagan did not know the names of the two bartenders, one whom he described as a "blond heavyset lady," the other whom he described as a "dark skinned man."  A bartender he knew as "Mr. Grullon" was not present.

According to Pagan, it was sunny when the day started but it began to snow.  He explained to the jury, "it was snowing that day and you know over ten people in the bar, . . . it's going to get - - the floor is going to get soaked at some point. . . . I let the . . . [male] bartender know that the floor was slippery."

After drinking two beers Pagan left the bar, walked through the billiards room, and used the bathroom.  On the way back to the bar, either in the area around the step or on the step, he slipped and fell.  Asked how he fell, exactly,

A-0232-17T2

he said he did not remember. Asked what caused him to fall, he replied, "[t]he wetness on the floor." He later made clear that he slipped on the step.

Pagan testified the bar had no signs that day warning of the wet floor, nor had it ever had such signs during the twenty-one years he had been going there. He also testified the lighting in the billiards room is "pretty weak, it's not enough lighting in there."

After falling, Pagan attempted to stand up but his leg gave out and he fell back down. Three men picked him up and carried him to the front bar and someone called an ambulance. While waiting for the ambulance, he was in such "horrible" pain that he drank approximately one-half pint of E & J eighty proof brandy. His foot was "off of [his] leg to the . . . right side." He described his foot as "jiggling on [his] leg."

Pagan's mother and stepfather arrived at the bar and spoke with him before the ambulance came and transported him to the hospital. Without objection, Pagan described his injuries, "a tibial fracture and a split leg bone." He also described his treatment in the hospital. He explained that he had surgery to repair his leg and has "a [seven] inch titanium rod and two screws . . . holding [his] leg together."

A-0232-17T2

Pagan remained in the hospital for approximately a week and upon his discharge—on crutches—"was basically in bed for seven months." He underwent physical therapy three times a month for approximately three months. During the year following his discharge from the hospital, he could not walk, felt helpless, and could not do much of anything, including playing with or taking out his son. Pagan described the situation as "sad, . . . very sad." He now walks with a slight limp and has a scar on his right leg from the surgery. He showed the jury the scar and demonstrated his limp.

A woman who recalled arriving at the bar at approximately 7:00 or 8:00 p.m. said she was playing pool in the billiards room when she saw Pagan fall. She knew him as "Tone." She said he "was walking up the stairs like saying hi, and I just seen him on the floor." According to her, he fell on his way to the bathroom and injured his leg; "[t]he bone was just sticking out."

During cross-examination, defense counsel asked this witness, "Did you have any trouble walking in and out of that area?" She replied, "I tripped over that step a couple of times." Defense counsel persisted: "Anything on that step that had caused you to trip before?" The witness replied, "Yes, the step." She also said she did not recall seeing anything wet on the step when Pagan fell, nor did he tell her he fell because the step was wet.

A-0232-17T2

Pagan's stepfather testified that after receiving a telephone call he and his wife went to the bar where his stepson "was lying sprawled out on the floor with one leg located underneath his body." According to the stepfather, a woman at the bar called an ambulance and then "we tried to . . . pick him up, but we weren't able to because he was in a lot of pain." He emphasized that he was lying on the floor at the entrance door to the business. He corroborated that Pagan remained on crutches for approximately one year following the accident.

As his final witness, Pagan called Crystalline's manager, Felix Grullon. On the day Pagan fell, the manager swept and mopped the floor when he opened the bar that morning. He neither swept nor mopped the floor again. He said, however, if something falls, such as a beer or a glass with ice, it must be cleaned.

Because he was in his office when the accident happened, the manager did not witness it. He had known Pagan for approximately ten years and claimed Pagan would frequently make purchases from the liquor store but would not sit and drink at the bar. On the day of his accident, Pagan came into the store but did not drink. Acknowledging there were cameras at the bar when Pagan fell, the manager said he did not think it was important to retain the video that would document how the fall had occurred.

A-0232-17T2

The defense presented the testimony of two witnesses, the bar's owner, Karina Acosta, and bartender Delores Grullon, the manager's sister. Acosta testified she had owned the bar with her husband, who had passed away. When he died, she moved to Florida. She was in the process of selling the bar to the manager, who ran it. Before leaving for Florida, Acosta instructed him about daily maintenance. "[T]hey would clean the floor in the morning and keep an eye on whatever could be on the floor, and before they leave at night they have to clean the floor." Acosta was not present when Pagan fell.

The bartender was at the front bar when Pagan fell. She testified he did not drink at the bar that day. When he entered the bar, he was drunk, and he needed to use the bathroom. After using it, he was leaving the bar when he fell "right at the front door, at the front entrance." When Pagan fell, her brother was in his office working and one other patron was in the bar. No one was in the billiards room playing pool.

The bartender said she cleaned the bar as soon as she arrived that day and the floor was dry. Routinely, she would sweep or mop the floor whenever it was necessary during the day. "If a drop of water were to fall on the floor, if a beer were to fall," the bartenders would clean it so that no patron would fall or slip on the floor. When Pagan fell, she went to his aid. There was nothing on the

floor that would have caused him to fall, nor did he complain about anything on the floor that caused his fall. There was no precipitation on the floor, as it did not start to snow until approximately five o'clock in the afternoon. The bartender denied that anyone gave Pagan brandy after he fell. She acknowledged there were video cameras in the bar on the day of the accident but claimed they had been damaged.

In addition to the two witnesses, the defense introduced into evidence a physical therapy note stating that Pagan admitted slipping and falling while intoxicated.

C.

Although Pagan had asserted in his pleadings, maintained in his opening statement, and presented through his trial proofs a single theory of liability— the bar's floor was wet from patrons tracking in precipitation and the bar did nothing to prevent patrons from slipping and falling—he added another during his summation. Based on the eyewitness who claimed to have seen Pagan fall on the interior step, Pagan's attorney repeatedly argued the step was in a defective condition.

For example, the attorney told the jury: "We know from [the eyewitness] that the stairs had actually almost caused her to fall on other occasions. Are

these dangerous stairs? How come the defense act[s] as if they don't even exist? Are they in the stairs? The danger exists." Later, counsel added: "So considering that, is the stair itself, even if it's not wet, isn't it potentially a dangerous condition?" He repeated his inquiry: "But the existence of that step and that people have tripped over it, do we really believe that Mr. Pagan is [the] first one that stumbled over that step?" Shortly before concluding, responding to the assertion Pagan was intoxicated, his counsel said: "I don't think - - to say that that caused the fall and this was the specific thing, where you have this location described by an independent witness that this is what causes the fall and she says, it's a dangerous condition indirectly or by inference."

Defense counsel did not object, but the court, following the closing arguments and dismissal of the jury, admonished Pagan's attorney for injecting a new theory of liability into the case. When the court noted it could grant a mistrial, defense counsel initially protested. Defense counsel requested the court give a curative instruction as the parties had invested time and effort trying the case. When counsel commented that a mistrial could be revisited after the verdict was rendered, the court disagreed. In response, defense counsel made what the court characterized as "a lukewarm application" for a mistrial.

A-0232-17T2

The court drafted a curative instruction, which Crystalline agreed upon. In its charge to the jury, the court began with the following instruction:

> THE COURT: All right. Ladies and gentlemen, in summation reference was made to an alternative theory of liability, that is that the step in this bar was a dangerous condition in and of itself without regard to any wetness. There is no evidence – I'm gonna instruct you that there is no evidence in the record to support this particular theory. The theory of liability to be considered by you is whether there was a wet floor, which would include the step, which caused a slippery condition in the bar. That would be the hazardous and/or dangerous condition alleged. And you must restrict your deliberations to that particular theory, not to whether the step in and of itself, without regard to wetness, was a dangerous condition.

The jury returned a verdict for Pagan. This appeal followed.

## II.

We first address the trial court's award of counsel fees to Pagan upon vacating the default judgment. The imposition of terms upon vacating a default judgment "pursuant to Rule 4:50-1 lies within the trial court's discretion and 'should be judged against the relative strength or weakness of the movant's application' and sustained 'when reasonably proportionate to the prejudice suffered by plaintiff.'" ATFH Real Prop., LLC v. Winberry Realty P'ship, 417 N.J. Super. 518, 528 (App. Div. 2010). When terms are imposed to ameliorate

prejudice to plaintiff resulting from granting the relief, we review the imposition of such sanctions for an abuse of discretion. Id. at 527-28.

Here, the costs incurred by Pagan were caused solely by defendants' delays in answering the complaint and filing a consent order to vacate the default. As a result of these delays, Pagan's attorney expended unnecessary time and incurred unnecessary expense. Consequently, we find no abuse of discretion on the part of the trial court in granting Pagan fees to ameliorate the wasted time and expense occasioned by the delay.

Having said that, we note the record does not necessarily support the imposition of sanctions against Acosta. After all, if the relief granted to Pagan was indeed equitable in nature, it is difficult to discern how it was equitable for Pagan to name Acosta as a defendant, apparently on the basis that she was a shareholder in the corporation. This is particularly so in view of the record being devoid of any basis to pierce the corporate veil. Yet, Acosta did not file a cross-appeal from the order. Consequently, we need not resolve the issue.

We reach a different conclusion concerning the inclusion of sanctions against defendants' attorney. The attorney who was sanctioned did not initially represent either defendant. There is nothing in the record to suggest any basis, equitable or otherwise, for sanctioning him. Moreover, there is nothing in the

14

appellate record that suggests the trial court gave any reason for imposing sanctions against the attorney. Accordingly, we vacate that part of the order imposing sanctions that includes defendants' counsel.

## III.

We next address the trial court's denial of the dismissal motions defendants filed—at the close of Pagan's proofs at trial and again after the verdict was rendered.

When Pagan rested, defendants moved for a "directed verdict." They did not specify whether they were moving for an involuntary dismissal under Rule 4:37-2(b) or a motion for judgment at trial under Rule 4:40-1. Nevertheless, the test is the same under both rules:

> whether "the evidence, together with the legitimate inferences therefrom, could sustain a judgment in . . . favor" of the party opposing the motion, i.e., if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied.
>
> [Dolson v. Anastasia, 55 N.J. 2, 5 (1969) (quoting Bozza v. Vornado, Inc., 42 N.J. 355 (1964)).]

15

When considering such a motion, "[t]he trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Id. at 5-6.

The trial judge denied the motion based on Pagan's testimony that the floor was wet, he told the bartender the floor was wet, Crystalline employees had made no effort to mop up the water, and Pagan fell on a wet floor. Accepting that evidence as true, and according to Pagan the benefit of all inferences which could reasonably and legitimately be deduced from that evidence, the evidence and legitimate inferences would sustain a jury verdict.

Crystalline argues that its attorney asked the trial court to take judicial notice of a weather report. If the document accurately reported the weather in the area of Crystalline's on the day of Pagan's fall, it would have raised considerable doubt about his theory that as a result of snow falling, patrons tracked precipitation into the bar. Pagan's argument fails, however, because the trial court did not take judicial notice of the weather report and he did not attempt to have the weather report admitted into evidence. Consequently, the report was never presented to the jury, even though the trial court had commented on it. We thus reject Crystalline's argument.

Next, Crystalline argues the judge erred by denying the post-verdict motion for a new trial it made under Rule 4:49-1(a).  The rule requires a judge to grant a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a).  We review a trial court's decision to grant or deny a motion for a new trial under the same standard.  Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011). Generally, trial courts exercise their discretion to grant a mistrial "with great reluctance, and only in cases of clear injustice. . . .  Neither trial nor appellate courts may grant a new trial unless it clearly appears there was a miscarriage of justice." Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005).

Crystalline sought the mistrial based on Pagan arguing in summation a new theory of liability, namely, the step between the bar and billiards room was in an inherently dangerous condition.  The issue of whether to declare a mistrial and grant a new trial presents a close call, particularly in view of so many credibility issues and factual disputes.  To be sure, there were many inconsistencies in Pagan's proofs.  On the other hand, there were inconsistencies in Crystalline's explanation about why there was no video surveillance footage

of Pagan's fall.  In such a close case, the trial court's decision is due considerable deference.

> [I]n ruling on a motion for a new trial, the trial judge takes into account, not only tangible factors relative to the proofs as shown by the record, but also appropriate matters of credibility, generally peculiarly within the jury's domain, so-called "demeanor evidence", and the intangible "feel of the case" which [the judge] has gained by presiding over the trial.
>
> [Dolson, 55 N.J. at 6.]

Here, considering the trial court's feel of the case, especially in the context of considerable conflicting proofs and credibility issues, we cannot conclude the court abused its discretion by deciding it did not clearly and convincingly appear there was a miscarriage of justice of the law.  Accordingly, we affirm the trial court's denial of Crystalline's motion for a new trial.

## IV.

We have considered Crystalline's remaining arguments and except for the following brief comments found them to be without sufficient merit to warrant further discussion.  R. 2:11-3(e)(1)(E).

Crystalline argues that when instructing the jury on fair and reasonable compensation for Pagan's injuries, the court should not have instructed the jury on awarding compensation for permanent injuries.  The trial was certainly

18

unusual in that Pagan presented his proofs on damages through his own testimony, with no testimony from any medical expert, and without introducing into evidence any medical records.

Defendants did not object to the method by which Pagan sought to prove his damages.  Perhaps defendant had no bona fide dispute with Pagan's testimony that he suffered a tibial fracture and underwent surgical repair of his leg, which included a seven-inch titanium rod and two screws attached to repair the fracture.  Significantly, there was no testimony that the rod and screws would ever be removed.  Cf. Gilhooley v. Union, 164 N.J. 533, 542-43 (2000) (explaining that "as is the case with dismemberment and disfigurement, when pins, wires, mechanisms and devices are required to make the plaintiff normal," the plaintiff has suffered "permanent injury resulting in a permanent loss of normal bodily function even if modern medicine can supply replacement parts to mimic the natural function").  In addition, without objection, Pagan displayed his surgical scar to the jury.

Crystalline did not object to the trial court's jury instructions.  Now, on appeal, he argues the trial court took judicial notice that Pagan had sustained a permanent injury.  The trial court did no such thing.  More importantly, Crystalline's argument—that there was no evidence of permanent injury—is

based on medical articles it has submitted on the appellate record. The articles address whether, in certain cases, hardware will be removed. Crystalline never presented the articles to the trial court. Thus, its argument based on those articles is unavailing.

Our consideration of Crystalline's arguments is based upon the record of the pre-trial, trial, and post-trial proceedings. Based upon the record of these proceedings, as well as the trial court's evaluation of the issues and arguments presented to it, we cannot conclude that any single error, or the alleged errors considered cumulatively, warrant a new trial.

Affirmed in part, reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION